BAKER v. CENTRAL TRUST CO. OF NEW YORK et al.

CARPENTER et al. v. SAME.

(Circuit Court of Appeals, Sixth Circuit. May 12, 1916. On Petition for Rehearing, July 7, 1916.)

Nos. 2732, 2764.

1. RAILROADS ⬤=138—RECEIVERSHIP—LIENS—TRAFFIC CONTRACTS.

A traffic contract between two railroad companies for the interchange of business, which by its terms was to continue for a stated number of years, and bound one company to pay to the other a percentage of its re-ceipts from the traffic interchanged, if necessary to meet the interest on an issue of bonds to be made by the latter, conceding its validity, created no lien on the property or income of the promisor as against subsequent

---

creditors or purchasers, but may be repudiated by its receiver, if deemed unprofitable, leaving to the other party or its bondholders only a general claim for damages for its breach.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 436–439; Dec. Dig. ⊜⊐138.]

2. RAILROADS ⊜⊐171(1)—PRIORITIES OF CREDITORS.

The fact that bondholders of the other company bought their bonds with knowledge of the traffic contract which was pledged by the mortgage for their security created no equity which entitles them to preference over subsequent lienholders of the promisor company, since they were also charged with knowledge of the legal effect of the contract, and that it gave them no lien.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 554–556, 568, 571; Dec. Dig. ⊜⊐171(1).]

3. CORPORATIONS ⊜⊐479—MORTGAGES—FORECLOSURE—PARTIES REPRESENTED BY TRUSTEE.

The trustee in a corporation mortgage represents the bondholders only in matters affecting the enforcement of the security and administration of the trust property under the terms of the trust.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1869, 1872–1874; Dec. Dig. ⊜⊐479.]

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; William L. Day, Judge.

Suit in equity by the Central Trust Company of New York, trustee, against the Wheeling & Lake Erie Railroad Company and others. From the decree, Horace F. Baker, receiver of the Wabash-Pittsburgh Terminal Railway Company, and E. E. Carpenter and others, cross-complainants, appeal. Affirmed.

See, also, 218 Fed. 273, 134 C. C. A. 69.

Pursuant to a plan to obtain for the Wabash Railroad Company (herein called "Wabash"), a line from Toledo, its eastern terminus, to, and an entrance into, and facilities in and about, Pittsburgh, by utilizing the line of the Wheeling & Lake Erie Railroad Company (herein called "Wheeling"), from Toledo, and by acquiring and constructing terminals at Pittsburgh, and a connection thence westwardly to the Wheeling, George J. Gould, a director of the Wabash, and Joseph Ramsey, Jr., its president, caused (February 1, 1901) a syndicate to be formed, with a subscribed capital of $20,000,000, for the acquirement and construction of terminal and belt facilities at Pittsburgh, and the purchase of equipment for their proper operation when completed. Of the subscribers, five were directors of the Wabash. The syndicate having acquired a majority of the stock of the Wheeling, elected in May, 1901, as directors, members of the Wabash directory and others under its control, and proceeded to acquire several railroad and coal properties at or about Pittsburgh, including the West Side Belt, and to construct the Pittsburgh, Carnegie & Western Railroad to a connection with the Wheeling.

The syndicate, thus in control of the Pittsburgh properties and the Wheeling, brought about a contract (May 10, 1902) by which, in consideration of the great outlay of the Pittsburgh, Carnegie & Western for the terminals, and as an inducement to it to construct its road, the Wheeling and the Wabash agreed that for 20 years, in fixing schedules and percentages on interchanged traffic, that road would be given an arbitrary of 100 miles as against its actual 60 miles and an arbitrary of 10 cents per ton for traffic originating on its line. Certain trackage rights were given including the operation by each of the parties of its through trains over the tracks of the others.

To provide more money for the enterprise, to permit the syndicate to realize on their investment, and to vest the practical ownership and actual

⊜⊐For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

control of the Terminal properties and the Wheeling in the Wabash, a plan was devised by which the Pittsburgh properties were, May 7. 1904, consolidated under the name The Wabash-Pittsburgh Terminal Railway Company (herein called "Terminal"); the Terminal stock was transferred to the Wabash, which paid $6,000,000 in cash for $6,600,000 of the Terminal's first mortgage bonds secured by mortgage May 10, 1904, to Mercantile (afterwards Bankers') Trust Company, of New York; the syndicate received $13,400,000 first mortgage bonds and an entire issue of $20,000,000 in second mortgage bonds ($2,000,000 for expenses), secured by mortgage to Equitable Trust Company of New York, and $10,000,000 of the Wabash stock. Under the plan a supplemental contract was agreed upon, but executed later (October 10, 1904), by which the first contract was extended to 1954, the date of maturity of the Terminal's bonds, and a requirement was added that the Wheeling and the Wabash pay an additional sum on interchanged traffic equal, when taken with the Terminal's net earnings. to the interest on the Terminal's bonds to the extent, if necessary, of 25 per cent. of each of those two roads' revenue from traffic interchanged with the Terminal.

The mortgages contained a specific pledge of "contracts, trackage agreements, or operating arrangements, covenants and agreements, terms, or parts of terms, including all the rights of the Railway Company under a certain Traffic and Trackage Contract dated October 10, 1902, and executed by The Wabash Railroad Company, The Wheeling & Lake Erie Railroad Company and the Pittsburgh, Carnegie & Western Railroad Company (of which last-named company the Railway Company, party hereto of the first part is the successor), and under a certain contract bearing even date herewith supplemental to said Traffic and Trackage Contract (a counterpart originals of which original and supplemental contracts have been deposited with the trustee hereunder) * * *," and of the shares constituting a majority of the Wheeling stock.

The Terminal, with the exception of 1,000 coal cars, held under lease by the West Side Belt, had practically no equipment. The Wheeling had considerable, though inadequate, equipment for the purposes of its own traffic, but in 1902 and 1903 apparently took care of its own traffic reasonably well. Operations of the combined roads began in July, 1904, but interchange of traffic not until at or about the time of the execution of the supplemental contract (October 10, 1904). Then began a diversion of a large part of the Wheeling's equipment to the hauling of traffic from the Terminal, to the detriment of the Wheeling and the shippers along its line. Early in March, 1905, the Terminal contracted with manufacturers for 62 locomotives, and 2,000 coal cars. 1,000 of which were delivered prior to August, 1905, and 1,000 not long afterwards. All the Terminal first mortgage bonds which could be issued had been disposed of, and it had no way of paying for this equipment. Money must be had, both to provide equipment to carry the traffic from the Terminal, and to make betterments and improvements on the Wheeling to enable it to properly handle its own and the Terminal's heavy coal trains, as well as other traffic, and to pay the Wheeling's floating debt of some $2,000,000 and a large sum coming due on its then outstanding mortgage bonds.

The Wabash, in the effort to save the enterprise, and the millions it had already invested in it, caused a plan to be adopted by which these obligations of the Wheeling could be paid, the betterments made, and the equipment contracted for by the Terminal paid for and utilized. It took the Wheeling's $8,000,000 3-year (due August 1, 1908) gold notes at 95 per cent., and, having guaranteed their payment, sold them to bankers at New York at the same price, who sold them to the public in the usual course of business. These were secured by $12,000,000 of bonds issued under the general mortgage of the Wheeling to the Central Trust Company of New York, as trustee, dated August 1, 1905. On the same day, the Wheeling entered into a trust agreement (called note agreement) with the New York Trust Company, by which it vested that company, the Terminal agreeing thereto, with the title of the equipment, and pledged with the trustee the $12,000,000 of bonds secured by the general mortgage, to secure the holders of the $8,000,000 in notes. The equipment was leased by the trustee to the Wheeling at a nominal price. The Wabash

handled the proceeds of the notes ($7,600,000 and some accrued interest) and paid to Blair & Co. and Read & Co., bankers of New York, some $2,200,000, including accrued interest, advanced by them to pay the equipment manufacturers contracted with by the Terminal, about $2,000,000 to pay the Wheeling's unsecured floating debt, large sums for interest on the Wheeling's underlying bonds, as well as some interest on the general mortgage bonds, and expenditures chargeable to capital account made in current operations, and about $3,425,000 to the Wheeling for betterments and improvements. There is no reason to doubt that all the money was spent on or for the Wheeling.

The interchange gave the Wheeling large increased tonnage. Its own equipment, the equipment acquired on the Terminal's contract, the equipment certain shippers on its own lines provided to assist in hauling their freight, and equipment leased to it at a fair rental by the Wabash in 1907, were used for the primary purpose of carrying the traffic interchanged with the Terminal at a great loss to the Wheeling and to the diminution of the revenues it would have received from shippers on its own line, as well as to the destruction of its plan of reorganization of its Coal Company (the Wheeling & Lake Erie Coal Company).

The Wheeling's own burdens, the burdens put upon it for the benefit of the Wabash, the Terminal, and the Terminal's bondholders, including large sums paid and due on interchanged business under the traffic contracts, the loss of its own business, by reason of the diversion of its equipment, together with the business depression of 1907, and the approaching maturity (August 1, 1908) of the gold notes, required legal proceedings for the appointment of a receiver. These were had by procurement of the Wabash, June 8, 1908, and B. A. Worthington was appointed receiver the next day. A few days before (May 29th), at the suit of the Wabash, receivers were appointed for the Terminal.

Default by the Wheeling in the payment of its gold notes due August 1, 1908, and its inability to pay interest on general mortgage bonds due August 1st, being certain, the Wabash, to protect its guaranty, arranged with Blair & Co. and Kuhn, Loeb & Co., bankers in New York, by agreement (July 31, 1908), to purchase the notes for it from their holders, who were notified by the bankers, by public advertisement, to present the same for payment at the office of Blair & Co. On August 1st $7,083,000 of the notes, and later in the year the remaining $917,000, were taken up by the bankers. August 1st the bankers presented $200,000 of the notes, and (August 31st) $7,716,000 were presented by the Wabash, as owner, to the Wheeling for payment, which was refused. At that time the Wabash was in full life, but, being insolvent, December 18, 1911, receivers were appointed. The money to take up the notes was advanced by Kuhn, Loeb & Co. ($3,000,000), Blair & Co. ($2,000,000), George J. Gould ($2,000,000), and E. H. Harriman ($1,000,000).

These bankers knew all about the traffic contracts and their pledge, and the pledge of a majority of the capital stock of the Wheeling for the benefit of the Terminal's bondholders—a knowledge doubtless shared by the street when the syndicate's bonds were put upon the market, and by their bankers in the fall of 1904, and by a number of other bankers who bought and sold a number of the Terminal's bonds, including probably some bought from the syndicate bankers.

The application (February 18, 1905) to the Stock Exchange for the listing of the Terminal's bonds, and the circulars of the bankers of a subsequent date, recite the pledge of the stock and the traffic agreements, the former stating the contracts as existing for the terms of the first and second mortgage bonds; that under them also the Wabash and the Wheeling had the right to run trains into Pittsburgh, and the Terminal had similar rights over their lines, and that the effect of the contracts was to unite the three roads as closely as it was possible to do so by operating agreement; and the most specific of the latter (Read & Co., June, 1905, closely identified with the Wabash and the syndicate) describing the Terminal as a terminal railway extension into Pittsburgh for the Wabash and the entire Gould system of 15,000 miles; that the bonds were secured by pledge of these valuable contracts, and that the control of the Terminal and the Wheeling by the Wabash inter-

wove the interests of the Wabash, the Wheeling, and the Terminal as one system not likely to be parted with under any conceivable circumstances. It does not appear expressly that any bondholder bought his bonds with knowledge of, or in reliance upon, any of these statements.

In September, 1908, the authority of the court first had, the receiver of the Wheeling repudiated both contracts and thereupon agreed with the receivers of the Terminal on a basis of compensation on interchanged traffic shown to be fair between the roads. On this basis the loss to the Wheeling during the operation of the contracts from 1904 to 1908 was about $900,000. In addition, there was evidence tending to show, though not, as found by the trial judge, of such satisfactory character as to be made the basis of a finding of an exact amount, that the loss in not being able to take care of the traffic on its own line, in that period, was a large sum of money.

The diversion of the Wheeling's equipment brought about the destruction of the plan formulated by it for the reorganization, under the name the Wheeling & Lake Erie Coal Company, of a coal company owned by it on its line and controlled by it as a subsidiary company, through which it carried on the business of mining coal, the railroad furnishing the coal's only outlet. The old coal company was in the hands of a receiver, with outstanding obligations of a mortgage securing about $1,000,000 of bonds, receivers' certificates, and other debts prior to the bonds. The plan and pertinent facts will be found in the case in this court of Wheeling & Lake Erie R. R. Co. et al. v. Carpenter, 218 Fed. 273, 134 C. C. A. 69, and their repetition would be useless here, except to say that the plan contemplated the ownership by the Wheeling of all the stock of the Coal Company, as reorganized, the bondholders accepting new bonds at 25 per cent. of the old, the retirement, within ten years, of $200,000 of "prior lien obligations," covering receivers' certificates, expenses of reorganization, etc., and, during that time, some of the new bonds on allotment out of the surplus earnings of the Coal Company. The mines were leased by the Coal Company to Hanna & Co.'s Mining Company, which agreed to mine a certain minimum number of tons a year at a price agreed upon, the Wheeling to contribute, for the benefit of the bondholders, a certain sum on every ton of coal transported by it, less such coal as it used for fuel purposes. The plan failed, primarily because the Wheeling did not furnish cars sufficient to haul away the coal the Mining Company was willing to mine, and could have mined and sold. In 1902 and 1903 the Mining Company mined more than the minimum, which was transported by the Wheeling with such equipment as it then had. Beginning with 1904, the falling off each year from the minimum was many thousand tons.

It had been held by the District Court at the suit of Carpenter et al. (the Coal Company's bondholders' committee) that the Wheeling, by its contribution contract, agreed to pay the prior lien obligations in full; but questions of priority between those bondholders, the holders of Wheeling general mortgage bonds, and the bondholders under the Terminal mortgages asserting liens on the Wheeling because of the traffic contracts, were reserved and transferred for final determination to the suit against the Wheeling, in which the trustee under the Wheeling general mortgage and the trustees under the Terminal mortgages were asserting liens on the Wheeling, each claiming priority over the other. The Carpenter Case coming here on appeal by the Wheeling and its receiver (218 Fed. 273, 134 C. C. A. 69), the decree of the District Court was modified on the ground that the Coal Company's bondholders' claim did not rest upon the Wheeling's express contribution contract, but sounded in damages for breach of an implied contract to furnish sufficient cars to haul away the coal Hanna & Co.'s Mining Company had agreed to mine; and the District Court was instructed to ascertain the exact amount due the bondholders on the basis of computation set forth in the court's opinion. This computation has not been made, so far as appears.

While the appeal was pending in the Carpenter Case, the District Court denied the Coal Company's bondholders' claim of priority by the same decree in which were adjudicated the claims of the trustee of the bondholders of the Wheeling under the general mortgage, and the claims of the trustees of the holders of the bonds of the Terminal for a lien upon the Wheeling and

priority in right of payment over the general mortgage bonds, the claim of the receiver of the Terminal, for it and its creditors, including the bondholders, for a specific performance of the traffic and trackage contracts, and claims for damages by the Wheeling and the Wabash against each other, as all these various claims were made, in substance now set forth:

*Duncan, receiver of the Wheeling,* for it and its minority stockholders, alleging the control and domination by the syndicate, the Wabash and the Terminal, from 1901 to 1908, setting forth the two traffic contracts made under that control; the invalidity of the contracts under the statutes of Ohio and the by-laws of the Wheeling; the unfairness of the contracts, and the diversion of the Wheeling's income and the Wheeling's equipment to the Terminal, to the Wheeling's loss; and praying that the contracts be canceled, that the claims of the Terminal against the Wheeling under the terms of the contract, be denied, that a note for $300,000, given by the Wheeling to the Terminal, and indorsed by the Wabash, be canceled, and that an accounting be had of the moneys paid under the contract and the losses sustained by the Wheeling, and that such sums be set off against other claims of the Terminal and Wabash asserted in the foreclosure proceedings.

*Baker, receiver of the Terminal,* claiming the importance of the two contracts as security to the Terminal and its bondholders, and the Terminal's right to their specific performance, both as against the Wabash and the Wheeling, alleging the attempt of the Wabash, through the Wheeling's general mortgage and gold notes and receivership of the Wheeling, to destroy the rights of the Terminal in the contracts and their security to the holders of its mortgage bonds; the invalidity of the $12,000,000 of Wheeling general mortgage bonds, and the irreparable injury to the Terminal and its bondholders if the contracts were terminated; and prayed that the contracts be sustained as constituting a lien upon the property and earnings of the Wabash and the Wheeling railroads superior and paramount to all claims under the Wheeling general mortgage, and under the trust agreement executed to the New York Trust Company, and that those companies be required to specifically perform all of the terms of the contracts, that the Wheeling general mortgage be declared void, or, in any event, subordinate to the rights of the Terminal, its bondholders and creditors, and that the $8,000,000 of gold notes either be held invalid or be subordinated to the rights of the Terminal and its bondholders.

*The Mercantile Trust Company (afterwards Bankers' Trust Company),* trustee of the Terminal's first mortgage bonds, and the *Equitable Trust Company,* trustee of the Terminal's second mortgage bonds, filed bills to foreclose their respective mortgages. and make the same claims and prayers, in the interests of the holders of the bonds issued under those mortgages, as does the receiver of the Terminal.

*The Central Trust Company,* for the holders of $12,000,000 of general mortgage bonds, and the *New York Trust Company,* for the holders of the $8,000,000 of notes, filed bills to foreclose, and allege, in appropriate pleadings, that the traffic contracts are invalid, because ultra vires the Wheeling Company, and void under sections 3300 and 3301, Bates' Ann. Ohio Statutes (sections 8806 and 8809, Ohio Gen. Code), as made in aid of the Terminal; that they were fraudulent; that, in any event, they were subordinate to the general mortgage and its bonds; that the Terminal and its mortgagees have no standing as creditors or stockholders of the Wheeling to attack the validity of its mortgage or pledge of its bonds; that the bonds were legally pledged, and, if not so strictly, are good to the extent of 75 per cent. under section 3290, Bates' Ann. Ohio Stat., 3d Ed. (section 8797, Ohio Gen. Code), and the holders of Wheeling notes are entitled to a lien upon the Wheeling property because it was intended by all the parties that they should have one.

*Carpenter, Leonard, Jr., and McCaddon,* for the bondholders of the Coal Company, allege that the bondholders of the Coal Company should be paid in preference to all other claims against the Wheeling, except the receivers' certificates, because to deny such relief would be a fraud upon the bondholders; that they are entitled to a preference over the Wheeling's gold notes because the notes were made in fraud of their rights, and other creditors of

the Wheeling; that the bonds are entitled to a preference over the claim of the Wabash Railroad and the interest of Gould in the three-year notes, because they were directly responsible for the mismanagement of the Coal Company and the Wheeling, and the diversion of the assets of those companies, and the resultant loss to the bondholders of the Coal Company; and that the bondholders of the Coal Company are entitled to priority over the bonds of the Wheeling, because the income of the Wheeling during the receivership, in an amount more than sufficient to pay the claims of these bondholders, has been diverted and used for the permanent upbuilding and improving of the Wheeling property covered by the mortgage to the Central Trust Company.

The District Court found the pledge of the general mortgage bonds in the sum of $10,133,333.33, to be valid; that the proceeds of the notes were used and expended for the purpose of purchase of additional equipment, and for additions to, and betterments of, the Wheeling, and for its other proper corporate purposes, and that the note agreement with the New York Trust Company is a paramount lien upon that sum in principal amount of those bonds, and the equipment pledged under the agreement; that the general mortgage is a lien upon all of the property of the Wheeling, subject to all prior mortgages and equipment covered by them; that neither of the traffic contracts constituted a lien in favor of the Terminal or its receivers, or the bondholders under its first and second mortgages, upon the property of the Wheeling, or prior to the Wheeling general mortgage, or the gold notes secured thereby, nor did they raise any equity superior to the general mortgage, or the notes; that certain of those constituting and controlling the syndicate were officers and directors and large and influential stockholders of the Wabash, who caused the execution by the Wheeling of the original 'traffic contract; that the syndicate, in the execution of the supplemental traffic contract, and in turning over the control of the Terminal, which controlled the Wheeling, acted in the interests of the Terminal; that the contracts were illegal under the laws of Ohio, were unfair to the Wheeling, and made in the interests of the Terminal; that the supplemental contract was a fraud upon the Wheeling and its stockholders; that from its date (May 10, 1904) to the time the receiver of the Wheeling was appointed (June 9, 1908) the Wabash and Terminal dominated and controlled the Wheeling, and wrongfully caused it to carry out the provisions of the two contracts; and that upon demands and counter demands between the Wheeling and the Wabash, growing out of the operation of the contracts and for equipment, rentals, ties, etc., there was a balance in favor of the Wabash of a large sum of money.

But the claim of the Wheeling against the Wabash, the Terminal, the bondholders of the Terminal, and its mortgagees, as trustees and individually, for damages for losses in its operations during the years 1904 to 1908, were denied, as not established by the evidence. The claims of the trustees of the Terminal mortgages, in the interests of their bondholders, and of the receivers of the Terminal, as well as the claim of Duncan, receiver of the Wheeling, for it and its minority stockholders, to priority over the general mortgage and the bonds secured thereby, and the holders of the gold notes, were denied; and the court, while holding that the Coal Company was an adjunct and agency of the Wheeling for the operation of its coal properties, denied the Coal Company's bonds were a preferred indebtedness of the Wheeling and denied all other claims of the bondholders hereinbefore set forth.

The Wabash, the Central Trust Company, trustee under the general mortgage, the New York Trust Company, trustee for the holders of the $8,000,000 in notes, the receiver of the Wheeling, representing that road, and its minority stockholders do not appeal. Baker, receiver of the Terminal, for it and the Terminal's bondholders, and Carpenter et al., for the bondholders of the Coal Company, appeal to the extent of the errors they assign.

The assignments of error relied on by Baker, receiver, are that the District Court erred in refusing to hold the Wheeling Company had power to enter into the original traffic contract; that the two contracts were entered into by the Wheeling in conformity with the laws of Ohio and the by-laws of the Wheeling; that some of the directors of the Wheeling were also members of the Terminal and Wabash, did not affect the validity of the contract;

that a majority of the stock of the Wheeling was owned by the Terminal when the supplemental contract was made, did not affect its or the original contracts' validity; that the contracts were fair and in the interests of all parties to them; that the Wheeling and its receiver and stockholders are barred by their laches from questioning the contracts; that the contracts were valid between the parties, and equally valid between the mortgagees of the Terminal and the mortgagee of the Wheeling; that the holders of the gold notes were not bona fide purchasers and cannot make claim of priority over the Terminal's mortgagees; that the general mortgage bonds were pledged at less than 75 per cent. in violation of the statutes of Ohio.

Carpenter et al. assign as error the refusal of the District Court to direct the receiver of the Wheeling to pay off the prior lien obligations of the Coal Company; to direct an accounting of the moneys diverted from the Coal Company by the Wheeling and its receiver; to decree the general mortgage void as against the bondholders of the Coal Company; to direct an accounting of the Coal Company's bonds, and to direct the receiver of the Wheeling to pay the amount found due in preference to the general mortgage bonds, or the claims of the holders of the $8,000,000 notes secured thereby; and in deciding that neither its former decree in the suit of Carpenter et al., finding that the obligation of the Wheeling to pay the prior obligations, nor the cause of action upon which that decree was based, constituted a preferred claim against the Wheeling; and that the decree in the cause of action in that case was not entitled to priority of payment by the receiver of the Wheeling over other creditors, and that the claim of the bondholders was only a general claim to the extent that the decree of the District Court respecting the same should be affirmed on the appeal pending therefrom.

Gould was not made a party to the suits.

In Case No. 2732:

Louis Marshall, of New York City, for appellant.

H. A. Kelley, of Cleveland, Ohio, for appellee Central Trust Co. of New York.

F. H. Ginn and J. G. Fogg, both of Cleveland, Ohio, for appellee Wheeling & Lake Erie R. R. Co.

W. R. Begg, of New York City, for appellee New York Trust Co.

In Case No. 2764:

D. A. Holmes, of New York City, for appellants.

W. R. Begg, of New York City, A. L. Smith, of Toledo, Ohio, and J. G. Fogg, of Cleveland, Ohio, for appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges, and HOLLISTER, District Judge.

HOLLISTER, District Judge (after stating the facts as above). [1] The receiver of the Terminal and its bondholders present their case in the alternative, claiming, first, that the contracts, being executory and specifically enforceable, and providing a fund for the payment of interest on these bonds, are, in their nature, liens upon, or confer rights in, the Wheeling's property or its income and revenue on continued interchanged business, and, as such, are prior in interest to subsequent lienholders with notice, and should, in equity, be specifically performed by the Wheeling and its receiver. Logically such a claim would include subsequent purchasers and mortgagees, with notice, until the contracts expire by time limitation. The argument proceeds upon the ground that the contracts were made in good faith through proper corporate action for the mutual and reciprocal advantage of the contract-

ing parties and sanctioned by law as declared in a number of important decisions. The general proposition is not disputed, and, for the purposes of this case, it may be assumed that the contracts were fair, that the Wheeling had power to make them, that corporate action precedent to their execution was regular, and the consideration for them was adequate. Nevertheless we are of opinion that they could not become a lien upon or charge against the Wheeling or its property while in the hands of its receivers or in any way supplant the rights of the holders of its general mortgage bonds with or without notice, or the purchasers of its property at a judicial sale made now or at any future time. The mere fact that they were executory and continuing in their nature, and gave rights to the Terminal in the future earnings of the Wheeling and to the Terminal's bondholders rights in those earnings as a fund to which they might look for the payment of their interest, does not alter the essential quality of the contracts, which involve only a personal promise by the Wheeling, for the breach of which an action for damages would lie, or for which a specific performance might be decreed, if the Wheeling were in full life and carrying on its business, if that equitable remedy gave more adequate relief than would damages at law. Such contracts do not run with the land or impose any lien upon the property. They convey no title in the railroad itself, or any interest in it, nor do they secure any particular sum of money. Express Co. v. Railroad Co., 99 U. S. 191, 200, 25 L. Ed. 319; Des Moines, etc., R. Co. v. Wabash, etc., R. Co., 135 U. S. 576, 581, 582, 10 Sup. Ct. 753, 34 L. Ed. 243.

It is sought to bring them within the principles upon which Joy v. St. Louis, 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843, and Cumberland Valley R. R. Co. v. Gettysburg & Harrisburg Ry. Co., 177 Pa. 519, 35 Atl. 952, were decided; but a consideration of these cases will show that, in the former, the contract in question under which the Colorado Railroad successfully claimed the right, as against subsequent mortgagees of the Wabash and the purchaser at the judicial sale on their foreclosure, to use the Wabash tracks through Forest Park at St. Louis, was the very instrument under which the Wabash itself acquired its trackage rights through the park. The contract was held to be a link in the Wabash's title, and specifically enforceable in favor of another railroad whose necessities in reaching the St. Louis Union Station required it to go through the park on the Wabash's tracks. In the latter case, the railroads, parties to the agreement, were, from the standpoint of equity, all in full life, notwithstanding certain consolidations, and no rights of subsequent lienholders had intervened to prevent the same railroad from carrying out the contract made in behalf of the bondholders of one of the railroads.

We know of no principle upon which these contracts may be fixed as a lien upon the Wheeling, or as a charge against its income in the hands of its receiver, or as against the subsequent general mortgage. The receiver repudiated the contracts, as was his right and duty to do if he thought, in the administration of his trust, it would be undesirable or unprofitable to adopt them. United States Trust Co. v.

Wabash Western Ry. Co., 150 U. S. 287, 299, 14 Sup. Ct. 86, 37 L. Ed. 1085; Dushane v. Beall, 161 U. S. 513, 16 Sup. Ct. 637, 40 L. Ed. 791; Central Trust Co. v. Land Co. (C. C.) 79 Fed. 19.

The Terminal and its bondholders having no lien on the Wheeling or charge against its revenues, it is obvious that they cannot be heard to dispute the validity of the general mortgage and the notes securing the same or the pledge of the bonds, or any question between the note-holders and bondholders and the Wheeling. It is immaterial, therefore, on this appeal, whether or not the bonds were pledged at an illegal discount, or whether or not the notes or any of them were past due when taken up. And, of course, no question of laches on the part of the Wheeling or its stockholders can arise.

[2] But the Terminal and its bondholders claim in the alternative an equity arising, as we understand their position, in this way: The Wabash and Gould and his associates caused it to be represented, through the statements to the Stock Exchange and circulars of the bankers, and the bonds themselves referring to the terms of the mortgage, that the contracts were specifically enforceable for the security of the interest on the bonds. This is a claim of estoppel.

They charge, further, that the Wabash, in bringing about the foreclosure of the general mortgage incapacitated the Wheeling from carrying out the contracts and caused their breach. This is a tort and sounds in damages. No claim is made for damages on this account, or for false representations, but they say all of these circumstances together constitute an equity entitling the Terminal's bondholders, as against the holders of the notes and the general mortgage bonds securing the same and their respective trustees, all having notice, to a lien or charge upon the Wheeling's property prior to the bond and notes. If we disregard the fact that no bondholder has been shown to have bought his bonds upon knowledge of the statement made to the stock exchange or in any of the circulars, and in reliance on the same, and assume that the bonds were so bought, it would not seem that these bondholders had a right to infer that the agreements were more than what they were said to be. It cannot be said that traffic and trackage contracts as described in the statement and circulars were such as in their nature to become charges upon the property or income of the Wheeling as against all subsequent purchasers, mortgagees and lien-holders. The strongest inference a purchaser of the bonds would be entitled to draw from what he saw in the statement, or the circulars, or both, was that, so far as legally it could be done, the three roads were tied together during the life of the bonds by traffic arrangements of advantage to the bondholders. Assuming the contracts to have been valid in all respects, we do not mean to say that, if the Wheeling continuing in full life had broken them, the Terminal and its bondholders could not have required their specific performance. But it is quite sure that no prospective bondholder could reasonably infer or had the right to infer or would infer that the Wheeling and the Wabash would survive all possible catastrophies for the 50 years of the contracts' life, and would, during all that time, be able to carry them out. Nor could they reasonably infer that in the event of such catastrophe to the

Wheeling, its receiver would not repudiate the contracts if he thought the interests of his trust required him to do so. Nor did the bondholders have reason to believe that a pledge of a majority of the stock of the Wheeling by the Terminal would prevent the Wheeling as a separate, distinct corporation, exercising its full powers (they at least had no knowledge to the contrary, if the fact were otherwise), from authorizing a loan and executing a mortgage to secure it for the purpose of bettering the Wheeling and keeping it going. Besides, the Terminal bonds were issued before the general mortgage was made, and, whatever the relation of the Wabash to it and the notes was, no estoppel could be raised by what the Wabash did after the bondholders bought their bonds.

Nor do equities arise in favor of the Terminal's bondholders because the Wabash brought about the $8,000,000 loan and caused the execution of the general mortgage and its foreclosure. The expenditure of the money it raised for the Wheeling on its guaranty of the notes, not only made the Wheeling a vastly better property, but it undoubtedly kept the Wheeling alive. Had not the interest on that road's underlying mortgage been paid, a foreclosure was imminent. The large floating debt was a threat to the Wheeling's existence, and yet much of that was contracted for the benefit of the Terminal and its bondholders. The enormous expenditure for equipment by which the Terminal was relieved from the contract it could not keep, saved the Terminal, and the equipment was used in the interest of the Terminal and its bondholders. The betterments inured largely to their benefit. The Wheeling's proposal to the Wabash for the $8,000,000 was on the express ground that the money was needed to properly carry out the provisions of the contracts, and to pay the floating debt incurred for like purposes. The expenditure of this large sum of money, by keeping the Wheeling going, kept the contracts in force for three years longer. It is true the receivership was precipitated at the procurement of the Wabash, but the Wheeling could not live under these contracts. It was insolvent, and a receiver for it was inevitable, even if the general mortgage were not in existence.

We see no basis for the operation of any equity in favor of these bondholders by which the rights of the note and general mortgage bondholders may be transferred to them. The District Court was right, under the issues, in denying these bondholders relief.

The prior lien obligations and the bonds of the Wheeling's Coal Company involved in Carpenter's suit were the debt of the Coal Company, secured by mortgage on its land and property. The bondholders took the bonds on that understanding. They knew the Coal Company was but an adjunct and agency of the Wheeling, yet they did not look to the Wheeling for the payment of those obligations to the holders thereof, and for the payment of the bonds to themselves, because of that relation, but expressly contracted with it for contributions to be paid by it to be applied, together with royalties paid by Hanna & Co.'s Mining Company, to the payment, first, of the prior lien obligations, and, second, to the bonds on allotment under the plan upon which the Coal Company was reorganized. It was undoubtedly expected that,

during the operation of the plan for its 10 years of life, the prior lien obligations would be paid off and something paid on the bonds, and then, by some new arrangement, the mortgage debt of the Coal Company, being by that much reduced, could be taken care of out of the mines of the Coal Company.

In the first Carpenter et al. suit the bondholders claimed an express contract by the Wheeling to pay all of the prior lien obligations, because of its contribution agreement; but this court held on Carpenter et al.'s first appeal (218 Fed. 273, 134 C. C. A. 69) that the contribution agreement covered coal only actually transported, less the railroad's fuel coal, and, upon that limitation, the plan would be a fraud upon the bondholders, because the amount of coal it transported was within its own control, thereby giving it the power to destroy, as it did destroy, the plan under which the Coal Company had been reorganized. It was therefore decided that underlying the plan there was necessarily an implied agreement to furnish sufficient cars to transport at least the minimum the Mining Company had agreed to mine, and that the loss or damage recoverable was to be ascertained by figuring royalties on the amount actually mined in 1902 and 1903, and on 700,000 tons annually for the succeeding eight years, plus the agreed contributions on the balance each year after deducting the amount of fuel coal bought that year for its own consumption by the Railroad Company from the Mining Company. As it turned out, that sum, on a rough figuring, was a small per cent. less than the face of the prior lien obligations; and the court below was directed to ascertain what the exact amount would be. But if the resultant had been more than the face of the prior lien obligations and interest, there would have been something to apply on these very bonds.

These bondholders claim that because the Coal Company was but an adjunct or agency of the Wheeling, the bonds are the obligations of the Wheeling itself, upon the established principle that a court of equity will disregard corporate forms when they have been used to do injustice. That principle is not applicable here, because absolute good faith, so far as the use of corporate forms and the relation of the Railroad Company to the Coal Company and to the bondholders are concerned, dominated the dealings between the bondholders and the Wheeling, and their entire transactions were on the basis of the Coal Company's separate and independent corporate existence. There is no ground upon which to base a finding that these bonds are, either at law or in equity, a debt of the railroad. Not being a debt of the Wheeling, it does not appear how they can be fixed as a lien on its property or charge upon the revenues or income in the hands of its receiver.

It does not appear that the amount of damages, as found on the first appeal, has been fixed, and the bondholders ask on this appeal a finding that the amount recoverable is a claim against the revenues derived by the receiver in the operation of the road by him, because it is of such character as to give it preference over the general mortgage bonds, and that, if it is not of such character, the Wabash and Gould brought about the failure of the plan by causing the execution

and operation of the traffic and trackage contracts, and the creation of the $8,000,000 debt and the execution of the mortgage to secure it, with their results, and, therefore, they and the holders of the notes and bonds should, in the interests of these bondholders, yield their rights thereunder.

Assuming that the amount of damages may still be fixed, and that such a contract is enforceable against the Wheeling in full life, it was in any event the Wheeling's personal obligation only, and when the receiver took possession in the foreclosure proceedings, and operated the road for the benefit of the bondholders, and did not adopt it as will appear, the rights of the bondholders were limited to the recovery of damages only.

But it is claimed that this court, on the first appeal, in effect held that the receiver must continue to pay contributions to the trustee of the bondholders under its express agreement. This is based on language found in the opinion (218 Fed. 273, 287, 134 C. C. A. 69, 83):

"Since the contribution was to continue until the prior lien obligations were paid, there can be no inequity in denying the application of the usual rule authorizing a receiver to elect not to be bound by a contract thought detrimental to his trust. The court below was right in setting aside its order discontinuing those payments."

At the time that was written, the court had not considered a modification made by the court below directing a cancellation of a former order authorizing the receiver to discontinue payments. The order, as modified, read:

"That the order of this court entered on the 14th day of December, 1908, authorizing the receiver of The Wheeling & Lake Erie Railroad Company to refuse to adopt the said contribution contract, be set aside, cancelled and held for naught; but nothing herein contained shall be construed as a direction to the receiver to adopt the said contract that matter being reserved for further consideration, as hereinafter set forth."

The District Court never did finally expressly authorize the receiver to adopt or repudiate the contract, although in the final decree made in that case and in the case in which the other parties claimed liens on the Wheeling, the two having been consolidated, the court found, on the claims of Carpenter et al.:

"Neither the said decree of April 12, 1912, as modified by said decree of September 27, 1912, nor the cause of action upon which said decree was based constitutes a preferred claim against the Wheeling Company and neither said decree nor said cause of action is entitled to any preference or priority in payment out of the property of the Wheeling Company or the receiver of said company over other general creditors of the Wheeling Company, and the said decree as so modified, but only to the extent that the same shall be affirmed on the appeal pending as aforesaid, constitutes only a general claim against the estate of the Wheeling Company, and is hereby allowed as such to be paid pro rata with other general creditors of the Wheeling Company."

This is the order from which Carpenter et al. now appeal, and necessarily decides that the receiver should not pay upon the contribution agreement as a continuing contract binding upon the property or on him, and was a direct affirmance of his conduct in refusing, as he did, to pay the contributions, although he had not been expressly author-

ized to adopt or reject the contract itself. We think that, under these circumstances, the receiver cannot be said to have adopted the contract, and what he did under the order of reservation amounted to a repudiation. He had the right to repudiate it, subject to the control of the court, if, in his opinion, it would be undesirable or unprofitable to adopt it.

But, whatever, the effect of the language used in the opinion in the case of Carpenter as between these bondholders and the receiver of the Wheeling, it could not affect rights under the general mortgage. Clearly this court, by reserving the question of priority in accordance with the reservation in the court below, did not intend to decide the question, even as against the Wheeling, or its receiver. The damages were the debt of the Wheeling for breach of contract, and partake of no other quality. They were made up by adding the amounts per ton the Mining Company would have paid the Coal Company and the contributions the Railroad Company would have paid the trustee of the bondholders during the life of the contract, if the minimum had been hauled.

Nor can the theory upon which, in equity, claims against a railroad are sometimes allowed in preference to the payment of mortgage bonds, because they are current debts and should be paid out of the current income, prevail for the reason—if there were none other—the consideration with which the bondholders parted for the agreements with the Wheeling did not in the slightest degree contribute to the continued existence of the railroad as a going concern. The many cases on this subject will be searched in vain for any principle upon which such a claim as this is awarded the priority sought. It would be useless to cite them.

The claim of these bondholders for priority arising from the alleged diversion by the Wheeling, or its receiver, of money due the Coal Company to pay taxes, and for repairs, which, under the plan of reorganization, the Mining Company agreed to pay, if otherwise maintainable, cannot be considered, because the record does not disclose any evidence of such diversion. It may be said, applicable to the bondholders, both of the Terminal and of the Coal Company, that they have not, in these actions, asserted any claim for damages against the Wabash and Gould and his associates, in the syndicate for bringing about the situation in which they find themselves, if such action were maintainable. Hence such questions are foreign to this appeal.

General equities claimed to arise as against Gould and the Wabash, growing out of their alleged conduct, including the bringing about, with knowledge, the breach of the traffic and trackage contracts by causing the execution of the general mortgage and the issuing of the notes, and the breach of the Wheeling's contract made for the benefit of the Coal Company's bondholders by causing the execution of the traffic and trackage contracts and the execution of the general mortgage and issuing of the bonds and notes, cannot be considered as against Gould, because, if there were no other reason, he is not a party to the suits. If such equities exist against the Wabash, it has been hereinbefore shown that the traffic and trackage contracts were made for the benefit

of the Terminal and its bondholders, and the $8,000,000 and interest which the Wabash borrowed from the bankers to take up the notes secured by pledge of the general mortgage bonds, was spent largely for the benefit of the Terminal and its bondholders and kept the Wheeling running in their interests for three years. The Wabash's interest in the pledge of the bonds is comparatively small after the bankers are paid. But its right to receive what there is is at least as strong as any equity these bondholders may have. It is at least a countervailing, if not a paramount, equity.

[3] Nor can Gould be said to be represented by the trustee of the general mortgage, or the trustee of the note agreement. Such trustees represent the bondholders only in matters affecting the enforcement of the security and administration of the trust property under the terms of the trust. Short on Railway Bonds and Mortgages, § 274. So far as any question involved in this case is concerned, the only powers the trustees had are such as were committed to them in the instrument creating the trust. Railway Co. v. Blair, 214 N. Y. 497, 511, 108 N. E. 840; Miller v. R. R. Co., 36 Vt. 452, 486, 487.

We are unable to see how, on the case made here, bondholders, either of the Terminal or of the Coal Company, have any claim on the property of the Wheeling, and, if they have, in what respect it is superior to the rights of holders of the general mortgage bonds.

From all of these considerations, it follows that the decrees of the District Court appealed from by Baker, receiver, and by Carpenter et al., should be, and they are, affirmed at the respective appellants' costs.

## On Petition for Rehearing.

Upon consideration of the petition for a rehearing filed by the appellants, we are of opinion that it should be, and it hereby is, denied.

But we think, upon further consideration of the record, that this court was not justified in holding that the Coal Company's bonds were not a debt of the Wheeling. The District Court, in its opinion, expressed the view that the Coal Company's bonds constituted a general claim against the Wheeling, if it should be necessary to assert the bonds as such a claim. But that court, in its decree, spoke as follows:

"The question of the allowance of the claim of the cross-complainants, E. E. Carpenter, Franklin Leonard, Jr., and Joseph T. McCaddon, against the Wheeling Company upon the $634,500 4 per cent. mortgage bonds as a general claim against the estate of The Wheeling & Lake Erie Railroad Company, to the extent of any balance of said bonds remaining unpaid after the property covered by the mortgage securing the same shall have been exhausted, is hereby reserved."

The question so reserved, whether or not these bonds constitute a general claim against the Wheeling, was not, therefore, before this court on the present appeal of these bondholders, and no finding should have been made upon it. The direct question was not presented, and the finding is not to be considered by the District Court as in prejudice of any conclusion that court may reach upon such reserved question, after all the parties concerned have had the opportunity to be heard, and is without prejudice to the rights of the parties, should that question be presented to this court upon appeal or error, as the case may be.