**In re INLAND GAS CORPORATION.**

**In re KENTUCKY FUEL CORPORATION.**
**COLUMBIA GAS & ELECTRIC CORPORATION v. LOCKHART et al.**

Nos. 7535, 7536.

Circuit Court of Appeals, Sixth Circuit.

June 28, 1937.

Harold A. Ritz, of Charleston, W. Va. (B. J. Pettigrew, of Charleston, W. Va., on the brief), for appellant.

George W. Jaques, of New York City (Caldwell & Gray and LeWright Browning, all of Ashland, Ky., and Milbank, Tweed, Hope & Webb, Samuel L. Rosenberry, and Wilber Stammler, all of New York City, on the brief), for appellees.

Before HICKS and ALLEN, Circuit Judges, and MARTIN, District Judge.

HICKS, Circuit Judge.

These two proceedings were heard together in the District Court and here. One opinion will suffice.

Inland Gas Corporation (herein called Inland) and Kentucky Fuel Corporation (herein called Kentucky) are being reorganized under section 77B of the Bankruptcy Act, as amended (11 U.S.C.A. § 207). W. E. Lockhart was appointed temporary trustee of the estate of each debtor. The principal assets of both consisted of oil and gas producing lands, leases and wells, pipe lines, etc.

On February 1, 1928, Inland executed to Chatham-Phenix National Bank & Trust Company and McNamara as trustees a first mortgage to secure $4,400,000 of First Mortgage 6½ Sinking Fund Gold Bonds, Series A, due February 1, 1938. The bonds were sold and about $4,254,700 in amount thereof are outstanding with interest in default since August 1, 1930. On June 1, 1928, Kentucky executed to the same trustees a first mortgage to secure $4,000,000 First Mortgage 6½ Sinking Fund Gold Bonds, Series A, due June 1, 1942. These bonds were sold and all except about $60,500 are outstanding with interest in default since June 1, 1930. Both Inland and Kentucky have outstanding also large amounts of Kentucky debentures.

In 1930, the debtors became unable to pay the rents, royalties, taxes, and other leasehold obligations upon their properties. On August 28, 1930, American Utilities & General Corporation, Hope Engineering Company and Moody-Seagraves Company, stockholders of American Fuel & Power Company, which owned a majority of the capital stock of both Inland and Kentucky, wrote the letter printed in the margin,[1]

---

[1] "August 28, 1930.

"Chatham Phenix National Bank and Trust Company and James F. McNamara,

"Trustees under mortgage or deed of trust of Inland Gas Corporation dated as of February 1, 1928.

"Dear Sirs:

"The undersigned stockholders and substantial creditors of American Fuel and Power Company, which owns over a majority of the outstanding capital stock of Inland Gas Corporation are advised that Inland Gas Corporation has insufficient funds for the payment of rents, royalties and lease obligations about to become due and payable, and unless furnished with funds will default in the payment thereof, and that it is about to become in default in the payment of taxes, charges and assessments assessed or levied upon its properties.

"In order to enable Inland Gas Corporation to continue its business and to

the receipt of which was acknowledged by the endorsement thereon, which is also printed. On October 4, 1930, these same stockholders wrote a similar letter except for the amount of money to be delivered therewith, to wit, $237,000, which letter bore a similar acknowledgment of its receipt.

On August 28, 1930, the same stockholders wrote a similar letter to the trustees under the Kentucky mortgage, with the exception that the amount of money to be delivered therewith was $13,106.59; and on October 4, 1930, they wrote a similar letter with the exception that the amount of money to be delivered therewith was $52,500.

Each of these four letters bears an acknowledgment of receipt identical with that printed. The amounts indicated in each were deposited in the Chatham Bank, a banking house of one of the trustees, and were paid out by it on checks drawn to various parties by Grayburn and Collins for the purposes indicated in the first and second paragraphs of the letters. Grayburn and Collins were, respectively, treasurer and assistant treasurer of the American Fuel & Power Company and of Inland and Kentucky, and before paying out the funds they wrote a letter to the trustees which stated:

"This money, you have advised us, has been deposited in a special account in your Banking Department, subject to the checks of either or both of us for the specific purpose of making the aforesaid payments, and we undertake and agree to apply the same only for such payments, and within thirty (30) days after payment to furnish

---

prevent forfeiture of the leases owned by it, and to prevent penalties in the payment of taxes and assessments, there is to be delivered to you herewith the sum of $15,344.46, to be applied by you, as trustees, pursuant to the provisions of Section 16, Article 5, of the mortgage or deed of trust of Inland Gas Corporation dated as of February 1, 1928, to the payment of rents, royalties, lease obligations, taxes, charges and assessments which Inland Gas Corporation is unable to pay and discharge, subject, however, to the following conditions:

"The aforesaid sums deposited with you shall be disbursed by you in the following manner: *You shall open in your banking department a special account, which shall be subject to withdrawal by checks signed by A. H. Grayburn and/or D. W. Collins.* Said A. H. Grayburn and/or D. W. Collins shall, within thirty days after disbursing said fund, certify to you in quadruplicate, the purposes for which said fund was applied, stating in detail the leases upon which said sums or any part thereof were paid, together with the amount applied to each respective lease and/or the amounts applied with respect to each tax, assessment or other levy against properties of the Inland Gas Corporation, one of such certificates so furnished to be retained by you, and one copy thereof to be mailed to each of the undersigned at the address appearing in your records.

"It is understood that to the extent that such sums so deposited with you and disbursed as hereinabove set forth, the undersigned are to be afforded each and every of the rights and claims against Inland Gas Corporation and/or the properties mortgaged under the aforesaid indenture as are set forth under the provisions of Section 16 of Article 5, *with the further understanding, however, that you assume no responsibility and make no representation as to the nature of such rights and/or claims.*

"The undersigned agree not to require payment of the moneys advanced by them hereunder except out of the surplus earnings of Inland Gas Corporation available after the payment of all charges required to be paid under the terms of said indenture, it being understood, however, that this agreement shall not affect any priority to which the undersigned may be entitled under the terms of the indenture, in the event of default and subsequent foreclosure and/or sale.

"Please acknowledge receipt of said sum to be used by you for the foregoing purposes, by signing a copy of this letter as indicated below.

"Very truly yours,

"American Utilities & General Corporation,

"By G. F. Balme, Vice-President.

"Hope Engineering Company,

"By E. P. Storch, Asst. Secretary.

"Moody-Seagraves Company,

"By J. F. Reed, Vice-President.

"The undersigned acknowledge the receipt of the moneys referred to in the foregoing letter to be used in accordance with the provisions thereof, *upon the condition that they shall be under no obligation to see to the use or application of said fund made by said A. H. Grayburn and/or D. W. Collins.*" (Italics ours.)

"Chatham Phenix National Bank and Trust Company,

"By H. E. Ahern,

Trust Officer."

you in quadruplicate a statement *of our disbursements* showing in detail the specific application of these funds.

"*It is understood that you are under no obligations whatever as to our application of said funds.*" (Italics ours.)

The American Utilities & General Corporation, Hope Engineering Company, and Moody-Seagraves Company owned more than a majority of the stock of the American Fuel & Power Company, which corporation in turn was the owner of more than a majority of the stock of Inland and Kentucky. It is thus clear that the three companies which wrote the letters and advanced the funds were largely interested in Inland and Kentucky, and if Inland and Kentucky or either should fail to meet their obligations, these three corporations would suffer.

In November, 1930, they assigned their claims against Inland and Kentucky for the moneys advanced, together with any security they had, to appellant, Columbia Gas & Electric Corporation. Appellant as assignee filed its claims against Inland and Kentucky in the respective reorganization proceedings and sought an adjudication not only to the effect that these claims were secured by the first mortgages of the debtors above referred to, but that they were entitled to priority of payment over the first mortgage bonds.

The District Court denied the relief sought and we concur.

The validity of appellant's demand must be determined upon a consideration of the letters of its assignors to the mortgage trustees in connection with section 15, art. 5 of the Kentucky mortgage with section 16, art. 5 of the Inland mortgage, which was identical, and the action or nonaction of the trustees. Section 15, art. 5, is as follows:

"Sec. 15. The Company covenants that it will pay and discharge seasonably all rents, royalties and insurance premiums payable by the Company, all taxes, charges and assessments assessed or levied upon the Company or upon any property of the Company and/or any liens which if not discharged would adversely affect the security of the bonds upon any property of the Company; and in case the Company shall fail seasonably to pay and discharge any such rents, royalties, taxes, charges, assessments, insurance premiums or liens prior to or superior to that of this Indenture, except in so far as such failure is expressly permitted by this Indenture on any part of the mortgaged property, or shall fail to pay when due the principal or interest of any indebtedness secured by any such lien prior to this Indenture on any part of the mortgaged property, or to procure and maintain reasonable and proper insurance thereon as aforesaid, the *Trustees* or either of them or the holder or holders of bonds in the aggregate principal amount of five per centum (5%) of the bonds issued and outstanding hereunder may pay such tax, assessment, charge or rental or royalty or principal or interest, or procure and maintain such insurance without prejudice, however, to the rights of the Trustees or of the bondholders hereunder arising in consequence of such failure, *and the Company covenants that it will on demand, repay to the Trustees or to such bondholder or bondholders any and all sums of money which shall have been paid by them on account of any such rents, royalties, taxes, charges, assessments, insurance premiums, liens, principal or interest, with interest at the rate of six and one-half per cent* (6½%) per annum from the time of such payment or payments, respectively, until the repayment thereof, and the amount of any such payment for rents, taxes, charges, assessments, insurance premiums, royalties, principal or interest, or other liens so made, with interest thereon, as aforesaid, shall become so much additional indebtedness secured by this Indenture and shall be given preference in payment over any of such bonds and coupons and shall be paid out of the proceeds of any sale of the mortgaged property if not otherwise paid by the Company, but nothing in this Section contained shall obligate the Trustees or either of them to make any payment as herein provided unless indemnified to its, his or their satisfaction against the expense thereof, or furnished the means therefor." (Italics ours.)

We need not enter into a discussion of the general powers of trustees under corporation mortgages for we are limited to the specific powers granted the trustees under section 15, art. 5 of the mortgages. Baker v. Central Trust Co., 235 F. 17, 31 (C.C.A.6). This section provides that if the Company (Inland and Kentucky) shall fail to pay the rents, royalties, taxes, charges, assessments, etc., accruing against the property, the trustee may pay such defaults and arrearages and the Company

covenants to repay the trustees with interest and that until such repayment is made the amounts of the payments with interest shall become additional indebtedness secured by the mortgage and be given preference in payment over the bonds.

As applicable here the provisions go no further. It was intended of course for the protection of the bondholders. There is nothing in it that justifies even a suggestion that payments made for the Company by strangers to the mortgage contract are clothed with the security of the mortgage or any right of priority in repayment.

Appellant recognizes this but says that the payments were in fact made by the trustees even though the funds used were supplied by appellant's assignors.

The answer is, that the proposition is in conflict with the findings of the District Judge, with which we find no reason to disagree. The facts are that the trustees made no payments for the company out of the funds supplied. The letters transmitting the funds stated that they were "to be applied by you as trustee pursuant to the provisions of Sec. 15, etc." But the third paragraphs of the letters particularized the manner in which the application of the funds was to be made. The trustees were to deposit them in their banking department and open a special account. At that point their obligation to appellant's assignors stopped. There is nothing to indicate that this account was even credited to the trustees. They were not authorized to draw upon it, it was to be withdrawn by checks signed by Grayburn and Collins who in no sense represented the trustees.

The trustees made no attempt to determine what obligations they were empowered to pay under section 15, art. 5 of the mortgage, and the letters relieved them of such responsibility. The notations upon the letters acknowledging receipt of the funds contained the condition that they (the trustees) "shall be under no obligation to see to the use or application of said fund made by said A. H. Grayburn and/or D. W. Collins." See also the letter of Grayburn and Collins to the trustees, partially quoted, wherein the writers refer to "our disbursements" and "to our application of said funds," and with reference to which the writers further state that "it is understood that you" (the trustees) "are under no obligations whatever. * * *" Reduced to its simplest terms, the trustees were to do no more than to allow their bank to accept the deposits of the advancing corporations and pay their checks.

Appellant insists that the trustees and the bondholders are estopped to deny their claim. We find no element of estoppel. Appellant's assignors were fully conversant with the situation. They not only knew the extent of the powers of the trustees under the mortgage but all the trustees did in response to their letters. They could not reasonably have believed from any acts or conduct of the trustees that the moneys advanced by them would become a prior lien upon the property of the companies. Such belief was not the inducement for supplying it. The advancements were made by appellant's assignors to protect their own stockholding interests which had become seriously imperiled.

Certainly the bondholders are not estopped. There is no evidence that they did anything to mislead. So far as the record discloses they were ignorant of the whole matter from its inception and no effort was made to advise them. If they had been advised they might have taken steps to protect their security against threatened impairment.

Appellant urges that it is entitled to be subrogated to the rights of the trustees under the provisions of Sec. 15, Art. 5, of the mortgages; but the trustees have no claim under that section. They advanced no money under its provisions and appellant's assignors were under no legal obligation to make the advancements for them.

Appellant claims that, all other questions aside, it is entitled to be subrogated to the Kentucky statutory tax lien which is a first lien upon the properties of Kentucky and Inland to secure the repayment of so much of its claims as represent taxes paid. But appellant's assignors were under no compulsion, legal or otherwise, to pay the taxes. They made the payments as strangers and volunteers and in such case the doctrine of subrogation does not affect the rights of the mortgagees. Gibson v. Western & Southern Life Ins. Co., 161 Ky. 810, 171 S.W. 390, L.R.A.1915D, 697.

The decrees of the District Court are affirmed.