STARK ELECTRIC R. CO. v. McGINTY CONTRACTING CO.

(Circuit Court of Appeals, Sixth Circuit.  January 9, 1917.)

No. 2851.

1. CORPORATIONS ☞617(5)—DISSOLUTION—PENDING SUITS.

The provisions of Code W. Va. 1906, c. 53, § 59 (Code W. Va. 1913, c. 53, § 59 [sec. 2891]), for the collection and distribution of the assets of a corporation whose franchise is annulled for failure to pay corporate license tax, are not exclusive, and suits either for or on behalf of the corporation, pending at the time of dissolution, are not abated.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2454;  Dec. Dig. ☞617(5).]

2. CORPORATIONS ☞630(1)—DISSOLUTION—RIGHT TO SUE.

At the time the contract in suit was made, plaintiff was a domestic corporation, organized under the laws of West Virginia, but in the year 1909 its charter rights and franchises were annulled for failure to pay the corporate license tax.  Code W. Va. 1906, c. 32, § 136 (Code W. Va. 1913, c. 32, § 136 [sec. 1269]), declares that the actual or attempted exercise of any powers under the charter of such corporation after the Governor's proclamation of delinquency shall be a criminal misdemeanor.  Chapter 53, § 59 (Code W. Va. 1913, c. 53, § 59 [sec. 2891]), provides for the collection and distribution of corporate assets.  Held that as the mode prescribed is not exclusive, the institution of suit on such contract was not prohibited, not amounting to an exercise, or attempt to exercise, any corporate power.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2482, 2483;  Dec. Dig. ☞630(1).]

3. CORPORATIONS ☞630(5)—DISSOLUTION—ACTIONS—PRESUMPTIONS.

In such case, it will be presumed that a suit by such corporation is for the purpose of collecting a debt for distribution, and the absence of evidence of corporate debts is immaterial, for the stockholders are entitled to corporate assets subject to payment of debts.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. ☞630(5).]

4. CORPORATIONS ☞621(1)—DISSOLUTION—RECEIVERS.

In such case, there was no imperative necessity for the appointment of a receiver.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2461–2464, 2469, 2471;  Dec. Dig. ☞621(1).]

5. CORPORATIONS ☞623—DISSOLUTION—TRUST FUNDS.

In such case, assets collected in suit by corporation constitute a trust fund, and are to be distributed by its directors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2472–2474;  Dec. Dig. ☞623.]

6. RAILROADS ☞25—CONTRACTS—EVIDENCE—SUFFICIENCY.

In a suit against defendant railroad company, evidence held to warrant a finding that defendant was the real party in interest to the contract involved;  the ostensible party being its mere buffer or dummy.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 57;  Dec. Dig. ☞25.]

7. RAILROADS ☞17—CONTRACTS—LIABILITY.

Where the defendant railroad company in building an extension organized a buffer or dummy corporation, and defendant and its officers

---
☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
238 F.—42

represented that defendant was the real party in interest, defendant is liable on contracts made by its dummy.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 36–38; Dec. Dig. ☜17.]

8. EVIDENCE ☜397(1)—PAROL EVIDENCE RULE—ADMISSIBILITY.
Parol representations are not admissible to vary a written contract, purporting to contain the entire agreement, in the absence of fraud or mutual mistake.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1756, 1763–1765; Dec. Dig. ☜397(1).]

9. EVIDENCE ☜445(7)—PAROL EVIDENCE RULE—ADMISSIBILITY.
Defendant railroad company, desiring to build an extension, contracted with plaintiff. The written contract made no provision as to the supporting of defendant's tracks during excavation, but it was intended, and both parties expected, that the extension should not interfere with the traffic. Defendant refused to remove its tracks out of the way of the excavation, and in making such excavations plaintiff supported the tracks. *Held*, that in such case parol evidence that defendant agreed to pay a greater price for the excavation to induce plaintiff to continue the work was admissible; the contract not purporting to speak on such matter and the agreement being collateral.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2062; Dec. Dig. ☜445(7).]

10. CONTRACTS ☜322(5)—CONSTRUCTION—RECEIPT OF PAYMENT.
In such case, plaintiff's acceptance of payment of vouchers for the contract price for the excavations is not conclusive against its right to recover the increased compensation, in view of testimony that such funds were received with an understanding that the balance should be paid when the entire work was done.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1465, 1534, 1535, 1538–1542; Dec. Dig. ☜322(5).]

11. LIMITATION OF ACTIONS ☜46(1)—RUNNING OF STATUTE—ACCRUAL OF ACTION.
Where a railroad contractor was to receive any balance due on the contract when the work was done, limitations against his right of action for such sums did not begin to run until the completion of the work.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 240, 251, 253; Dec. Dig. ☜46(1).]

12. PRINCIPAL AND AGENT ☜101(1)—AUTHORITY OF AGENT—EFFECT OF.
Where the agreement was within an agent's apparent authority, such agreement cannot be defeated by proof of lack of actual authority.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 255, 330, 346; Dec. Dig. ☜101(1).]

13. TRIAL ☜139(1)—PROVINCE OF COURT AND JURY—SUBMISSION OF ISSUES.
Where there is evidence in support of a cause of action, it is properly submitted to the jury.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 332, 333, 338–341; Dec. Dig. ☜139(1).]

14. CONTRACTS ☜284(4)—CONSTRUCTION—DUTY OF ENGINEER.
Where a construction contract required the work to be done to the satisfaction of an engineer whose judgment should be conclusive on both parties, and who should be entitled to decide all controversies, the engineer's action is final and conclusive, and binding on the parties in the absence

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of fraud, or such gross mistake as to imply bad faith, or failure to exercise an honest judgment.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1326, 1334; Dec. Dig. ☞284(4).]

15. APPEAL AND ERROR ☞1068(4)—REVIEW—HARMLESS ERROR.

In an action on a construction contract, which provided that the work should be performed to the satisfaction of the company's engineer, whose judgment should be conclusive on the parties, and who should have power to determine all controversies, the court charged that the action of the engineer was final, conclusive, and binding on the parties, and that his judgment could only be impeached when he has been so grossly mistaken that the mistake would suggest nearly something akin to fraud on his part. After the contractor had quit work, the engineer gave a final quantity sheet based on a completed contract, which stated the quantities of the several classes of labor called for by the written contract, and the first oral contract at the prices provided for therein, together with the amounts for each class of labor and the aggregate thereof. The contract provided that the engineer's certificate should be given only when in the opinion of the engineer the contractor shall have finally completed all the work contemplated. There was testimony tending to show that the engineer in making the statement intended to accept the work done by the contractor subject to such deductions as should be necessary to complete the work in respects stated by the engineer. *Held* that, where there was a verdict for the contractor for the full amount without any deduction, any error resulting from the instruction must be deemed cured by a deduction of the amount stated by the engineer as necessary to complete the contract.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4228; Dec. Dig. ☞1068(4); Trial, Cent. Dig. § 558.]

In Error to the District Court of the United States for the Northern District of Ohio; John M. Killits, Judge.

Action by the McGinty Contracting Company against the Stark Electric Railroad Company. There was a judgment for plaintiff, and defendant brings error. Affirmed, with modification in case plaintiff enters remittitur; otherwise, reversed, and new trial directed.

H. B. Webber, of Canton, Ohio, for plaintiff in error.

Luther Day, of Cleveland, Ohio, and John T: De Ford, of Minerva, Ohio, for defendant in error.

Before WARRINGTON and KNAPPEN, Circuit Judges, and McCALL, District Judge.

KNAPPEN, Circuit Judge. The defendant in error (hereinafter called plaintiff) sued plaintiff in error (whom we shall call defendant), together with the Interurban Construction Company, for breach of a contract by which plaintiff agreed to do certain grading for the construction of an extension of defendants' line from its terminus at Sebring, Ohio, to Salem, Ohio. At the conclusion of the testimony, taken on a trial by jury, plaintiff was required to elect as to which defendant it would prosecute, and elected to proceed against the railroad company. Plaintiff had verdict and judgment, and defendant's motion for a new trial was overruled. The errors assigned relate to the introduction of testimony, the denial of motions for directed verdict, and for new trial, the refusal of requests to charge and the

charge as given. The suit involves several causes of action, to which specific defenses are made. Two defenses were presented going to the entire right of action, viz.: That plaintiff lacks legal capacity to sue; and that defendant was not a party to the contract sued on.

[1, 2] 1. Plaintiff's capacity to sue: When the contract in suit was made (June 22, 1903), and during the entire period of its performance, plaintiff was a domestic corporation organized under the laws of West Virginia. In the year 1909 its charter rights and franchises were annulled under the statutes of that state for failure to pay the corporate license tax, together with certain penalties and fines. By section 1058 of the then existing Code (Code 1913, c. 32, § 136 [section 1269]), the actual or attempted exercise of "any powers under the charter of any such corporation," after the issuing of the Governor's proclamation of delinquency, was made a criminal misdemeanor. Provision was made by statute for the winding up of affairs of a dissolved corporation by action of the public authorities, as well as on behalf of stockholders representing a given interest, including the appointment of receivers over the corporate assets and affairs; and defendant contends that the effect of these statutes is to forbid the maintenance of this suit. But section 2287 of the Code (Code 1913, c. 53, § 59 [section 2891]) expressly provides for the bringing and continuing or defending of suits—

"in the corporate name, in like manner and with like effect as before such dissolution or expiration; but so far only as shall be necessary or proper for collecting the debts and claims due to the corporation, converting its property and assets into money, prosecuting and protecting its rights, enforcing its liabilities, and paying over and distributing its property or assets, or the proceeds thereof, to those entitled thereto."

These statutory provisions for winding up and distributing the assets are not exclusive. Donnally v. Hearndon, 41 W. Va. 519, 526, 23 S. E. 646. And suits either for or on behalf of the corporation pending at the time of the dissolution are expressly held not abated thereby. Lumber Co. v. Ward, 30 W. Va. 43, 54, 3 S. E. 227; Board of Education v. Berry, 62 W. Va. 433, 442, 59 S. E. 169, 125 Am. St. Rep. 975. Stiles v. Coal Co., 47 W. Va. 838, 847, 35 S. E. 986, is not, in our opinion, an authority to the contrary. In the later case of Lumber Co. v. Coal Co., 66 W. Va. 696, 702, 66 S. E. 1073, 1075 (29 L. R. A. [N. S.] 1101), the court said that "the prosecution and defense of actions, respecting valid contracts, do not constitute doing business within the meaning of the statutes, restricting the right of foreign corporations," and that among the rights not taken away by the revocation of the right to do business was the right to sue upon a valid contract, and also the right to make defense in any action instituted against it. True, the corporation there involved was a foreign one, but the statutory provisions in the respect here involved are the same; and in the still later case of Comstock v. Lumber Co., 69 W. Va. 100, 102, 71 S. E. 255, 256 (which involved a domestic corporation whose charter had been forfeited), it was held that the phrase " 'exercise or attempt to exercise any power' under the charter, must be read as if it said carry on

the business of the corporation," and Lumber Co. v. Coal Co., supra, was cited as holding that the term "doing business" does not extend "to the mere act of suing or defending suits in respect to contracts made or rights acquired, while the corporation had power to do business"; the court saying, further, that "the power to sue and make defense is incident to property and contract rights," and that "its continuance, after the right to do business or exercise the ordinary corporate powers has ceased, is necessary to the preservation of rights lawfully acquired, and which the Legislature cannot be deemed to have intended to destroy or leave unprotected by denying or withholding it."  In Lively v. Picton (C. C. A. 6) 218 Fed. 401, 407, 134 C. C. A. 189, we held the statute in question not intended to "interfere with the right to sue an expired or dissolved corporation." It is true that in the cases cited the suit was against the corporation, but we see no reason why the express terms of the statute should not equally extend to suits on its behalf.  A somewhat analogous statute of New Jersey has been similarly construed.  American Surety Co. v. Great White Spirit Co., 58 N. J. Eq. 526, 530, 43 Atl. 579.  The dissolution under the New Jersey statutes has likewise been held not to preclude bankruptcy proceedings against a corporation.  White Mountain Paper Co. v. Morse & Co. (C. C. A. 1) 127 Fed. 643, 62 C. C. A. 369; In re Munger Vehicle Tire Co. (C. C. A. 2) 159 Fed. 901, 87 C. C. A. 81.

[3-5] In the absence of proof we think it should be presumed that this suit is being prosecuted for the purpose of collecting a debt due the corporation, for purposes of distribution.  The absence of proof of the existence of debts is not material.  The corporation being dissolved the stockholders owned its property, subject, of course, to the payment of debts.  Stearns Coal & Lumber Co. v. Van Winkle (C. C. A. 6) 221 Fed. 590, 593–596, 137 C. C. A. 314.  Distribution for their benefit is equally within the proper purpose of winding up proceedings, and for the mere collection of debts due there was no imperative necessity for a receiver.  Stearns Co. v. Van Winkle, supra. The proceeds of collection are, of course, held by the corporation as a trust fund, to be distributed by its directors.  We conclude that plaintiff had legal capacity to maintain this suit.

[6] 2. Was defendant properly held a party to the contract in suit? The contract, which was in writing, was in form made by plaintiff with the construction company, which was a corporation and legally distinct from the railroad company.  The jury was instructed that plaintiff could recover against the railroad company only upon being convinced that the "construction company, for the convenience of the * * * railroad company, and with the knowledge of everybody interested in the transaction, was masquerading, acting for and put forth substantially as the Stark Electric Railroad Company," and that if so satisfied by clear and convincing evidence, the railroad company could be so held.  McGinty, who represented plaintiff in negotiating and making the contract, testified that the offer (which with its acceptance constituted the contract) was, as written by him, addressed to the Stark Electric Railroad Company; that he had never

heard of the construction company; that his preliminary negotiations and agreement were with Morley, who was both president and manager of the railroad company; that Morley suggested having the offer typewritten, and retained McGinty's pen draft for that purpose; that on a later date it was signed without being read by him and in ignorance that the typewritten offer was addressed to, and the acceptance signed by, the construction company; that he first learned that fact about six weeks later, after several weeks' work had been done under the contract; that he then told Morley that he did not wish any contract with the construction company; that his proposition was "with the Stark Electric Railroad Company"; that Morley said they were having a hard time to get right of way from the farmers, and that the construction company was just "a sort of buffer between the * * * railroad company and trouble"; that the construction company was "practically the same thing" as the railroad company, that the latter was behind it, and that "you will get your money, so you need not be alarmed on that score." There was also other testimony tending to show that the interurban company was, so far as concerns the extension in question and for its purposes, used by Morley and the railroad company as a mere instrumentality of the latter, in effect a "dummy" or "buffer"; that Morley and his associates, who constituted a majority stock interest in each company, dominated the operations of both companies; that a few days before the contract sued on was made its corporate stock, of which Morley was a prominent holder, he being one of its officers, was transferred to certain persons without consideration, and who, while only nominally stockholders, were made directors and officers of the construction company; that the latter kept its office with the railroad company, which paid all the office expenses, including the bookkeeper and stenographer used alike by both companies; and that Morley, while having no apparent interest in the construction company, in reality managed its affairs (apparently without salary) in connection with those of the railroad company, sometimes writing letters to plaintiff on railroad company stationery, sometimes on that of the construction company; that the latter, not long after the completion of the work under the contract in question, ceased to hold meetings and do business. The capital stock of the construction company was $5,000 (but $1,000 had been paid in); that of the railroad company, $1,000,000.

The record would, we think, support a finding that the construction company was used with respect to the extension in question, 'for the purpose (among others) of enabling the controlling stockholders in the railroad company (who were the controlling stockholders in the construction company) to obtain a personal profit to themselves out of the building of the extension by acquiring a large block of railroad company stock, which went, with certain bonds given by the railroad company, to the construction company in connection with this construction. The force of these considerations is not necessarily overcome by the facts that the construction company maintained a legal and independent corporate existence; that the

construction of the railroad from Canton to Sebring had been done through its instrumentality; that it formally made contract with the railroad company for the construction of the extension here involved, and had means to pay all claims made against it under such construction; and that a substantial amount of its stock was held by those not connected with the railroad company.

It is urged that McGinty's testimony referred to was not corroborated, and that it was discredited by his acquiescence in the written contract, by his making the additional contracts hereafter referred to, by subletting parts of the work as under the construction company, by proceedings taken to obtain a subcontractor's lien against that company as well as the railroad company, and in other ways. But these considerations affect merely the weight of the evidence, which, taken together, we think sufficient to sustain a finding, not only that plaintiff believed in good faith that its contract was in reality with the railroad company, but that the construction company for the convenience of the railroad company, and with the knowledge of everybody interested in the transaction, was, with respect to the contract in question, "masquerading, acting for and put forth substantially as" the railroad company.

[7] We think the question of fact stated was properly submitted to the jury, and that, upon such facts being found the railroad company was properly held liable. Pennsylvania R. R. Co. v. Anoka Nat. Bank (C. C. A. 8) 108 Fed. 482, 485, 486, 47 C. C. A. 454; Gay v. Hudson River Co. (C. C. A. 2) 187 Fed. 12, 14, 109 C. C. A. 66; Foard Co. v. Maryland (C. C. A. 4) 219 Fed. 827, 829, 135 C. C. A. 497; McDonald, Shea & Co. v. Railroad, 93 Tenn. 281, 24 S. W. 252. There is nothing opposed to this conclusion in the decision of this court in Kardo Co. v. Adams, 231 Fed. 950, 146 C. C. A. 146.

The remaining criticisms relate to specific items of plaintiff's demands.

[8, 9] 3. The first cause of action embraces a claim for extra work performed in excavating on Weaver Hill, which lies between Canton and Alliance. The contract provided a price of 40 cents per cubic yard therefor. In fact, when the contract was made the railroad tracks were in position at the location where plaintiff's work was to be done, traffic was being maintained thereover, and was continued throughout the excavation work. Testimony was admitted to the effect that when the contract was being negotiated defendant assured plaintiff that it would remove the tracks far enough to be out of the way of the excavation work (which contemplated a deep cut), that such agreement would be embraced in the specifications, and that the contract price was fixed under such inducement. The specifications (which plaintiff claims not to have seen until six weeks after the contract was made) did not contain this provision. There was testimony that defendant did not remove the tracks, and that after the work was entered upon plaintiff refused to proceed further with that portion of it unless the tracks were so removed, or unless defendant would pay an additional price for doing the work with the tracks kept in condition for traffic, that the defendant claimed to be

unable to get right of way for temporary track purposes, and that Morley agreed to pay what the work was thus reasonably worth, and that the work was done under such agreement. Plaintiff claims $1 per cubic yard as a reasonable price. The amount at 40 cents per cubic yard was paid upon vouchers, the difference ($6,816) represents the additional compensation claimed. The defendant criticizes the testimony of the alleged oral agreement as incompetent. It is the well-settled rule that parol representations are not admissible in the absence of fraud or mutual mistake, when the written contract purports to contain the entire agreement. Seitz v. Brewers' Co., 141 U. S. 510, 516, 12 Sup. Ct. 46, 35 L. Ed. 837; Marmet Coal Co. v. Peoples' Coal Co. (C. C. A. 6) 226 Fed. 646, 650, 141 C. C. A. 402, and cases cited.

Plaintiff insists that the assurance in question was the inducing cause of the contract, and was a collateral agreement. It is conceded that if the agreement was of the latter nature, it was admissible, but such nature is denied. The jury was instructed, in effect, that if they found that the contract was made on defendant's assurance that it would remove the tracks, and that defendant subsequently agreed verbally to pay the additional reasonable value of the work occasioned by their maintenance, recovery could be had. It is conceded that the work could not have been done with the tracks in place unless they were blocked up. Plaintiff claims to have kept 30 or 40 men doing such work and transferring the tracks from side to side. It is clear that, by the strict letter of the contract, plaintiff could have done its work without supporting the tracks, thereby suspending operation of the railroad, unless the tracks were removed. Defendant denied any agreement, before the contract was made, to remove the tracks, and denied an agreement to pay additional compensation, claiming that defendant itself actually supported and moved the tracks during the excavation work. It is evident, however, that both parties expected that the excavation should not interfere with traffic, defendant claiming to have secured right of way, for the temporary use of the tracks, before the contract in question was made. On this subject the contract did not purport to speak. We think it was thus competent to show the circumstances surrounding the making of the contract, including the assurance claimed as inducement to its making.

[10] The fact that plaintiff received payment of the vouchers at the original contract price is not conclusive against it, in view of McGinty's testimony tending to show that the money was received with the understanding that the balance should be paid "when the whole job is done."

[11] The defense that the claim under the alleged verbal contract was barred by limitation was made in the charge to turn upon when the payment was to be made. There was testimony that payment was to be made "when the whole job was done," and that "the whole job" was not done until August 2, 1904, which was less than six years before suit was begun. In view of what we have said, we

think defendant was not prejudiced by the admission of the criticized testimony, nor by the charge of the court on the subject.

[12] It is urged that Morley had no authority from the board of directors to make the Weaver Hill modification, and that without such authority the agreement would not bind defendant. There was testimony from which the jury might properly infer that the agreement was within Morley's apparent authority, and in such case liability would not necessarily be defeated by lack of actual authority. Swift & Co. v. Detroit Rock Salt Co. (C. C. A. 6) 233 Fed. 231, 234, 147 C. C. A. 237, and cases cited.

[13] 4. The second cause of action is for certain grading within the limits of Salem (performed under a subsequent verbal contract), for which plaintiff claims $5,128.60. The defense that this item is barred by limitation was submitted to the jury under proper instructions. There was testimony that the item was not completed until August 2, 1904, which was less than six years before suit was begun.

The third cause of action is for excavating for masonry, under a verbal contract, the amount claimed being $853.33. To this claim, the statute of limitations was pleaded. The particular excavation in question seems to have been finished at a date which was in fact more than six years before suit was begun. Plaintiff claims, however, that the right of action accrued August 2, 1904 (the date when the entire work done by plaintiff for defendant was completed), which would be within six years. The controlling question is whether there was evidence substantially tending to show an understanding that the excavation in question was not to be paid for until the entire work done by plaintiff for defendant was completed. We think an implication of such understanding was, in view of all the evidence, at least permissible, and that it was not error to submit such question of fact to the jury.

[14] 5. The written contract in suit provided for payment for the work not at a gross amount, but at certain unit prices for different classes of work, all of which was required to be done under the direction and supervision and to the satisfaction of the construction company's engineer, whose "measurements shall be conclusive on both parties," and who was given power finally and conclusively to decide all controversies between the parties as to "the execution of the work." Provision was made for payments "from time to time on monthly engineer's estimates, in writing, of the amount of work done," and for final payment only upon final estimate by the engineer, "when, in his opinion, the work shall have been fully completed." Defendant contended that the work was not in fact completed according to the contract, and that the construction company was compelled to expend more than $1,800 in completing it. The court charged that the construction company's claim, if any, was out of the case, so far as permitting recovery therefor, and could "only be used as tending to show any defective or uncompleted work, under the contract, that the plaintiff did." Defendant also contended that no final engineer's estimate was given, and that in fact the work was not done to the engineer's satisfaction, and asked an instruction that the engineer's

action with reference to the amount and character of the work done, its conformity to the contract, and the amount to be paid, "was final and conclusive and binding upon the parties to said contract, and in the absence of fraud on the part of said [engineer] or of such gross mistakes on his part as to imply bad faith or for failure to exercise an honest judgment" his decision would be final and conclusive. This instruction was not given in the language asked, the court's charge differing, so far as we think here material, only in that it stated that the engineer's "judgment in this respect can only be impeached when you find that he has been so grossly mistaken that the mistake will suggest nearly something akin to fraud on his part."

The requested instruction as to the engineer's functions correctly embodied the applicable law. Memphis Trust Co. v. Brown-Ketchum Iron Works (C. C. A. 6) 166 Fed. 398, 93 C. C. A. 162; Second National Bank v. Pan-Amer. Bridge Co. (C. C. A. 6) 183 Fed. 391, 105 C. C. A. 611.

[15] We are not required to determine whether this modification of the charge, standing alone, worked error. Indeed, it seems highly improbable that the jury found any actual fraud in the engineer's action. The important question is whether the modification of the requested instruction, together with the charge as given, relating to the expense of finishing uncompleted work, caused prejudicial error. On August 27, 1904, after plaintiff had quit work, the engineer gave plaintiff what is entitled a "Final Quantity Sheet Based on a Completed Contract," which contained quantities of each of the several classes of labor called for by the written contract and the first oral contract, at least, at the prices provided for therein, together with the amounts for each class of labor and the aggregate thereof. (We do not understand defendant to claim that the excavation for masonry under the second oral contract was not fully made.) We think this document in form sufficient to comply with the contract, so far as the technical furnishing of estimates is concerned; and, as defendant has taken the benefit of plaintiff's work, the absence of a more formal document would not be enough to defeat recovery, provided the contract had been substantially performed. We think the testimony would amply sustain a conclusion of substantial performance. The engineer's "final quantity sheet" showed work amounting to more than $62,000, not including the extra price claimed for work on Weaver Hill. McGinty testified that the contract was completed "in every particular." The deficiencies claimed were of a minor character, amounting, at the utmost, to but 3 per cent. of the entire work called for.

We also think the sheet mentioned imported prima facie the engineer's approval, for the specifications provided for its being given only "when, in the opinion of the engineer, the contractor shall have finally completed all the work contemplated under the contract and specifications." There was testimony that the engineer had expressed himself to plaintiff as satisfied with its performance. And while we do not hold that the giving of this sheet was conclusive of the engineer's satisfaction, we think it fairly deducible from his testimony

as a whole that, while he had criticized plaintiff for not progressing with the work rapidly enough (plaintiff likewise criticized defendant for delaying its work by failing to secure right of way promptly), he intended, in making the statement, to accept the work done by plaintiff as a completion of the contract, subject to such deductions as should be necessary to complete it in the respects stated. He testified that when the statement was prepared—

"the work had been completed [afterwards saying "by somebody"], and I supposed somebody would want a basis on which to make the statement, so I proceeded to make it out. That in my opinion was intended by me to be the final estimate; that covers the completed work."

He testified, further, that all the work included in the statement was done by plaintiff, with certain exceptions to which he had previously referred, testifying, in that connection, to deficiencies in yardage, etc., necessary to complete the contract, and that to supply these deficiencies would cost $1,020.60. While we are disposed to think defendant should have been recompensed for the loss incurred in completing plaintiff's contract according to the engineer's judgment, notwithstanding the expense was in form incurred by the interurban company (for, under the theory on which recovery was permitted, defendant in the end bore whatever loss there was in that respect), yet we think defendant not prejudiced by either the instruction or the modification of instruction referred to, provided credit is given for the amount of such loss. We also think that such necessary expense should be limited to the amount stated by the engineer; for, while there was testimony that the amount was greater than the figures given by the engineer as necessary for that purpose, the engineer's figures as to the unit basis of prices are not discredited, defendant's claim, as we understand it, being that the engineer failed to include as necessary work which defendant thought necessary to completion, Morley testifying:

"I agree with [the engineer] in that the work was not completed. I don't agree with [him] as to what he said was the extent in which the work was not completed. I don't think he covered the whole thing in his testimony."

It need scarcely be said that the engineer's conclusions as to what was necessary are equally binding on defendant as on plaintiff. Our conclusion is that whatever prejudicial error may have been committed in respect to the contract under consideration will be cured by deducting from the verdict the sum of $1,020.60, with included interest thereon. It may be that had plaintiff supplied all these deficiencies it would have been entitled to further allowance under the contract. It may also be that the jury deducted the amount stated in whole or in part. But the record is not clear enough in our opinion to justify as basis of a remittitur a deduction of a less amount.

6. We think the defenses of payment and of abandonment (except so far as the latter may be involved in what we have already said) were properly submitted, and under appropriate instructions.

The motion for new trial was addressed to the sound discretion of the court, and we find nothing indicating an abuse of discretion in denying the motion.

We have not discussed all the errors assigned, but we have considered all discussed by counsel, with the result that we find no error of which defendant is, in our judgment, entitled to complain, except in respect to the item discussed under paragraph 5 of this opinion.

If before the mandate goes down plaintiff makes, in the court below, a remittitur of $1,020.60, with interest at 6 per cent. from August 2, 1904, to April 4, 1914, and files with the clerk here a certified copy of such remittitur, the judgment so modified will be affirmed, but with costs to plaintiff in error; lacking such remittitur, the judgment will be reversed and a new trial awarded.

⬤⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes