NEW YORK TRUST CO. et al. v. CARPENTER et al.

(Circuit Court of Appeals, Sixth Circuit. May 7, 1918.)

No. 3112.

1. RECEIVERS ⬤═188—APPEAL.

Where plans for the reorganization of an insolvent railroad company in the hands of a receiver had been perfected but the receiver had not been discharged and was still prosecuting claims on behalf of the company recovery on which would be assets in his hands, he has sufficient interest to appeal from the allowance of a claim against the company, as has a trustee for holders of the company's notes whose deficiency judgment on mortgage bonds securing the same was kept alive by the reorganization plans and had been assigned to the company's successor as one of its assets.

2. CORPORATIONS ⬤═377(1)—LIABILITY OF PRINCIPAL CORPORATION FOR SUBSIDIARY—"ADJUNCT."

Where the bondholders of an insolvent coal company which was controlled by a railroad company consented to a reorganization plan recognizing the separate existence of the two companies but providing for delivery to the railroad company of all of the stock of the reorganized coal company, the bondholders cannot thereafter hold the railroad company liable for the debts of the coal company, the reorganization plan having proved unsuccessful, on the theory that, as the coal company had been judicially declared to be an "adjunct" of the railroad company, which term is defined by lexicographers as something added to another, the railroad company was liable for its obligations, for courts of equity will disregard separate corporate existence only on the ground of agency or estoppel, or when injustice is done.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Petition by E. E. Carpenter and others against the Wheeling & Lake Erie Railroad Company, which was in the hands of a receiver. From a decree for petitioner, the New York Trust Company, as trustee of the Wheeling & Lake Erie Railroad Company, and W. M. Duncan, as receiver thereof, appeal. Reversed.

This is known as the "Third Carpenter Case." Wheeling & Lake Erie R. Co. v. Carpenter, 218 Fed. 273, 134 C. C. A. 69, and Baker v. Central Trust Co. and Carpenter et al. v. Same, 235 Fed. 17, 148 C. C. A. 511, are respectively known as the "First Carpenter Case" and the "Second Carpenter Case."

It will be useful to refer as briefly as may be to pertinent facts found in the lengthy reports of those cases, and such others as are found in the respective records of the two reported cases, as well as in the record of this case.

The Wheeling & Lake Erie Railway Company, owning a large part of the stock of the Wheeling, Lake Erie & Pittsburgh Coal Company, controlled it

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

as a subsidiary company and through it had carried on the business of mining coal. Both properties were in the hands of the same receiver, the receiver of the Coal Company mining the coal in the Coal Company's lands adjacent to the railroad which furnished the coal's only outlet. The Railway Company, on reorganization, became the Wheeling & Lake Erie Railroad Company, hereinafter called "Wheeling." There were outstanding against the coal lands a mortgage made by the Coal Company, securing something less than a million dollars in bonds; and also receiver's certificates and other debts prior to the bonds finally fixed in amount at $200,000. These were known as "prior lien obligations," of which Hanna & Co. afterwards became the owner. The bondholders of the Coal Company appointed a reorganization committee who dealt with the Wheeling in the adoption of a plan devised and brought about by it through the committee. It was reorganized under the name of the Wheeling, Lake Erie & Pittsburgh Coal Company (hereinafter called "Coal Company").

The plan was embodied in a series of agreements to be operative for a period of ten years: A contract between Hanna & Co.'s Mining Company with the Coal Company to pay to the Coal Company a royalty on a minimum of coal to be mined annually; a contract (called contribution contract) between the Wheeling and a trustee of the Coal Company's bondholders to pay a certain number of cents to the trustee on every ton of coal mined by the Mining Company and transported by the Wheeling, less such number of tons as it might take for its own fuel purposes; a contract between the Mining Company and the Wheeling for its fuel coal; the issue by the Coal Company of all of its capital stock to the Wheeling and of $200,000 in prior lien obligations and $634,500 of 4 per cent. bonds both secured by a mortgage of the Coal Company, the prior lien obligations being given priority over the bonds.

The royalties at the minimum and the Wheeling's contribution, if the plan had been carried out, would have produced during the ten years of its life, a sum sufficient to have discharged the prior lien obligations, to have paid taxes and the interest on the bonds, and to have established a sinking fund applicable to the payment of the bonds on allotment.

The consideration for the delivery of all the stock of the Coal Company to the Wheeling and the scaling of the bonds of the old Coal Company of 25 per cent. of their face for bonds in the Coal Company was the benefits to the bondholders to be derived from the operation of the plan, which, it was believed by them and by the Wheeling, would yield a sum not only sufficient for the immediate purposes of the plan, but, by reason of much greater production than the minimum, to produce a large sum applicable to the payment of the bonds after the prior lien obligations were discharged.

For the first two years the plan operated reasonably well, although the operations of the Mining Company were hampered by the failure of the Wheeling to furnish cars sufficient to haul away the coal which the Mining Company could produce.

Afterwards the lack of equipment became acute. The Mining Company refused to pay certain back royalties and the Wheeling discharged the Mining Company from that obligation, and, in the same agreement, reduced the minimum the Mining Company was to mine to an annual production far below what the necessities of the plan required. The Wabash Railroad Company had acquired control of the Wheeling and the properties of the Wabash-Pittsburgh Terminal and operated them in the interests of the Wabash's purpose to obtain a seaboard outlet for the Wabash in which the Wheeling and the Terminal were connecting links. In furtherance of that purpose a large part of the equipment of the Wheeling was used in hauling coal originating on the Terminal through the operation of onerous contracts on interchanged traffic between the terminal and the Wheeling. These brought about the collapse of the Wheeling and necessarily the destruction of the Wheeling's plan of reorganization of the Coal Company for both of which properties the same receiver was put in charge.

The District Court made an order authorizing the receiver of the Wheeling to refuse to adopt the contribution contract. There was therefore no source to

which the bondholders of the Coal Company could look for the payment of the prior lien obligations, and they, for their protection, appointed a committee (Carpenter et al.) who brought the First Carpenter Case against the Wheeling, its receiver, the Coal Company, and its receiver, the trustee under the mortgage securing the bonds, and the trustee under the Wheeling's contribution contract. The purpose of the suit was to set aside the agreement between the Wheeling and the Mining Company by which the Mining Company was excused from paying certain back royalties and the minimum production of coal required by the plan was reduced as hereinbefore set forth, and to specifically enforce the contribution contract as an agreement to expressly pay the prior lien obligations and for other equity relief.

The relations between the Wheeling and the Coal Company were set forth in the bill. The District Court upheld the validity of the agreement of the Wheeling. with the Mining Company, set aside the order authorizing the receiver to refuse to adopt the contribution contract, and, after reciting that nothing in the decree in that behalf should be construed as a direction to the receiver to adopt the contract, reserved that matter for further consideration, and, by its final decree holding that the receiver should not pay on the contribution contract as a continuing agreement binding upon the Wheeling's property or on him, directly affirmed his conduct in refusing, as he did, to pay the contributions. 235 Fed. 17, 29, 148 C. C. A. 511.

It was also found that the Coal Company was but an adjunct to or an agency of the Wheeling, by which it carried on the coal business, and that the Wheeling, by its contribution contract, agreed to pay off the prior lien obligations; but, since the mortgagees and other lien holders of the Wheeling were not parties to that suit, the question raised by the claim that the prior lien obligations were a lien on the Wheeling was reserved for consideration in the suit brought to foreclose the general mortgage on the Wheeling, the two suits having been consolidated.

The Wheeling, its receiver, and others appealed from the finding that the Wheeling was expressly obligated to pay off the prior lien obligations, and from other findings. This court held that the contribution contract did not give these bondholders the right to require the Wheeling to pay off the prior lien obligations, but that its relations to the Coal Company were such, including its ownership of all the stock of the Coal Company, its domination of the reorganization committee of the bondholders, and its representations to the bondholders through the plan of reorganization of the Coal Company which it devised and brought about, that there was underlying the plan an implied agreement by it to furnish sufficient cars to haul away at least the minimum number of tons annually, the Mining Company had agreed with the Coal Company to mine, and that, failing to do so, it would be a fraud on these bondholders to hold the Wheeling liable only for the amount of contributions on coal actually hauled by it, less fuel coal, because the success of the plan depended upon the Wheeling's furnishing sufficient cars, a matter entirely within its own control. This court held these bondholders were entitled to damages to be ascertained by figuring royalties on the amount of coal actually mined by the Mining Company in the first two years and on the minimum for eight years, plus the agreed contributions on the balance each year after deducting the amount of fuel coal bought that year by the Wheeling for its own consumption.

"As it turned out, that sum, on a rough figuring, was a small per cent. less than the face of the prior lien obligations; and the court below was directed to ascertain what the exact amount would be. But if the resultant had been more than the face of the prior lien obligations and interest, there would have been something to apply on these very bonds." 235 Fed. 28, 148 C. C. A. 511.

Pending that appeal, Carpenter et al. for the bondholders of the Coal Company filed a cross-bill in the suit to foreclose the general mortgage on the Wheeling, asking, among other things, that an accounting be had on their bonds, for a judgment directing its receiver to pay the amount found due in preference to any claim on Wheeling bonds secured by its general mortgage. and that the amount to be found due them in the First Carpenter Case, be-

cause of the nonpayment by the Wheeling of the prior lien obligations, be declared to be a lien on the Wheeling's property and on the assets and income in the hands of its receiver. The reasons for the priorities claimed are not now important, but the cross-bill again set out the relation between the Wheeling and the Coal Company. This was the Second Carpenter Case.

The District Court decided that the amount, if any, found to be due from the Wheeling on the cause of action asserted in the First Carpenter Case to be ascertained through the pending appeal was only a general claim against the Wheeling, denied their claim that the bonds were a lien on the Wheeling, and reserved the question whether the bonds were a general claim against it as to any balance remaining unpaid after the property mortgaged to secure the bonds was exhausted. 235 Fed. 17, 31, 148 C. C. A. 511.

In the District Court's written opinion, the view was expressed that the bonds were a general claim and the reservation was made in the subsequent decree. When, after our opinion was filed in the Second Carpenter Case, attention was called on petition for a rehearing 235 Fed. 17, 31, 148 C. C. A. 511, to the reservation in the decree, we directed that whatever was said in the opinion to the effect that the bonds were not a debt of the Wheeling was not to be considered as in prejudice of any conclusion the District Court, or this court on appeal, might reach on the reserved question.

A suit had been brought by the trustee in the mortgage securing these bonds against the Coal Company and others to foreclose the mortgage. In that case, Carpenter et al. intervened in behalf of bondholders. The lands were sold for the amount of the prior lien obligations and interest; the bid was assigned to Hanna & Co., their holders, who turned them in on account of the purchase price; and these bondholders took a judgment against the Coal Company for the full amount of their bonds and interest. Neither the Wheeling nor the New York Trust Company was a party to that proceeding. It is sought, in behalf of these bondholders, to establish this deficiency judgment against the Coal Company as a general claim against the Wheeling. And this is the Third Carpenter Case. The District Court held the deficiency judgment to be a general claim against the Wheeling.

Meantime, the Wheeling was reorganized on the basis of exchange of old securities for new, including the recognition of general claims by the exchange for them of certain securities of the new Railroad Company under its plan of reorganization. This plan necessarily includes a recognition, both of the right of these bondholders against the Wheeling on the cause of action asserted in the First Carpenter Case in such sum as shall be ascertained when the amount is determined by the District Court, as directed by this court in the First Carpenter Case, and of the deficiency judgment on these bonds, if that judgment was properly decided to be a general claim.

This appeal is by the Wheeling and its receiver and by the New York Trust Company, trustee for the holders of $8,000,000 of three-year notes of the Wheeling secured by a pledge of $12,000,000 of the bonds of the Wheeling secured by its general mortgage. There are but two questions involved. One is the claim of Carpenter et al. that appellants have no appealable interest, and hence their appeal should be dismissed; and the other, whether or not the deficiency judgment is entitled to be established as a general claim against the Wheeling.

Squire, Sanders & Dempsey, of Cleveland, Ohio, and Byrne, Cutcheon & Taylor, of New York City (W. B. Sanders, of Cleveland, Ohio, W. R. Begg, of New York City, and W. M. Duncan, of Cleveland, Ohio, of counsel), for appellants.

Holmes, Rogers & Carpenter, of New York City, and Frank H. Ginn, of Cleveland, Ohio (Delevan A. Holmes, of New York City, of counsel), for appellees.

Before WARRINGTON and KNAPPEN, Circuit Judges, and HOLLISTER, District Judge.

HOLLISTER, District Judge (after stating the facts as above). [1] The motion to dismiss the appeal will be overruled, for the reasons that the receiver has not been discharged; he is still prosecuting claims in behalf of the Wheeling, recovery on which will be assets in his hands; and the deficiency judgment obtained by the New York Trust Company, as trustee for the noteholders, has been by the plan of reorganization of the Wheeling expressly kept alive and has been assigned to the Wheeling's successor and is one of its successor's assets.

[2] The appellants, while denying that these bonds or the deficiency judgment on them are a debt of the Wheeling and a general claim against it, urge a number of reasons why they cannot be so recognized, even if they could otherwise be established. These reasons need not concern us now, because in our opinion there is no ground upon which to fasten these bonds or the deficiency judgment on the Wheeling as its obligation, either by contract, express or implied, or on principles of agency, or of estoppel, or by operation of law, or by reason of any finding of any court in the somewhat complicated litigation presented by these records.

The District Court in the First Carpenter Case found:

"That the Pittsburgh, Wheeling & Lake Erie Coal Company was organized and at all times managed and controlled by the Wheeling & Lake Erie Railroad Company as an adjunct to or agency of said railroad company for the operation of the coal property owned by it."

With this finding as a premise, the Coal Company's bondholders claim, as an inevitable corollary, that their bonds are the obligation of the Wheeling as if it had executed them itself. They concede "that ownership by one corporation of all the stock of another does not of itself create liability," and "that the mere fact that one corporation controls the affairs of another does not of itself create liability," but they say:

"That a court of equity will ignore corporate fiction in two classes of cases: First, where the holding company has created its subsidiary company in fraud of the rights of creditors; and, second, where the subsidiary company has been created simply as an adjunct or instrumentality of the holding company."

They base this assertion and its consequences on language found in the opinion of the Circuit Court of Appeals in the Second Circuit in the case In re Watertown Paper Co., 169 Fed. 252, 256 (94 C. C. A. 528), wherein exceptions to the rule of a corporation's separate and distinct entity are thus stated:

"(1) The legal fiction of distinct corporate existence will be disregarded, when necessary to circumvent fraud. (2) It may also be disregarded in a case where a corporation is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality or adjunct of another corporation."

This language was quoted by the same court in Gay v. Hudson River Elec. Power Co., 187 Fed. 12, 14, 15, 109 C. C. A. 66, and was adopted in Hunter v. Baker Motor Vehicle Co., 225 Fed. 1006, 1015 (D. C.).

This court (Pittsburgh & Buffalo Co. v. Duncan, 232 Fed. 584, 587, [146 C. C. A. 542]), in denying the claim that one of the corporations involved in that case ·was liable for the debt of the other, said:

"The mere fact that the stockholders in two or more corporations are the same, or that one corporation exercises a control over the other through ownership of its stock, or through identity of its stockholders, does not make either the agent of the other, nor does it merge them into one, so as to make a contract of one corporation binding upon the other, where each corporation is separately organized under a distinct charter. * * * True, the legal fiction of distinct corporate existence will be disregarded when necessary to prevent fraud, or when a corporation is so organized and controlled and its affairs so conducted 'as to make it only an adjunct or instrumentality of another corporation.'"

In re Watertown Paper Co., Gay v. Hudson River Elec. Power Co., and Foard v. Maryland, 219 Fed. 827, 829 (135 C. C. A. 497), were cited, and it was said further:

"* * * * 'It requires a strong case to induce a court of equity to consider two corporations as one, on account of one owning all the capital stock of the other.'"

The underlying reason for the decision was that no injustice was worked through the normal operation of corporate forms, or by according the corporation the separate entity which the law gives it; and the reference to the so-called second exception was rather a memorandum of decisions elsewhere on a question, cognate, but collateral only, to the point decided.

We do not think these decisions establish a hard and fast rule of law from which there is no escape, whatever the circumstances of the case under consideration, and without regard to the reasons upon which any exception could properly be founded.

Of course, if a corporation is the agent of another, owning its stock or not, as the case may be, through which the other as principal, disclosed or undisclosed, carries on business, the liability of the principal will be ascertained through principles of law well known and long established. But it is not claimed that the Coal Company was the Wheeling's agent in this sense. It was not and could not be, because the bondholders with full knowledge dealt with the Wheeling as principal in the contribution contract, and with the Coal Company as principal in the execution of the bonds. The District Court used the word "agency" as a synonym of "adjunct," whatever that may mean, and as descriptive of a relation variously defined in the cases as "adjunct," "branch," "instrumentality," "dummy," "buffer," and "tool," but all in the sense of "means" through which a corporation's own business is actively prosecuted; or of the relation created when two corporations are in substance identical though operating under different names. But in every case in which a corporation has been held liable for the debt of another because of dominance or control through stock ownership or otherwise and not depending on principles of agency or estoppel, the reason was that to hold otherwise would result in a wrong for which the law must find a remedy. For the purposes of this discussion, "agency," "adjunct," "branch," "instrumentality," "dummy," "buffer," and "tool," all mean very much the same thing.

250 F.—43

"Adjunct" is defined by Webster to be: "Something added to another thing, but not essentially a part of it." Murray's definition is: "Joined or added (to anything); connected, annexed; subordinate. Something joined to or connected with another, and subordinate to it in position, function, character or essence; either as auxiliary to it, or essentially depending upon it." If "adjunct" is to be given its defined meaning, its use is unfortunate, for it describes a relation the opposite of that which the court using it had in mind, and all systems of control exercised by corporations over their subsidiary companies through ownership of stock or because of identity or substantial identity of stockholders or directors are illegal, and the rule of the separate entity and responsibility of corporations for their own acts and contracts is swallowed up in the exception. This cannot be.

From an examination of many decisions, we venture to say that no corporation acting within its powers has been held liable for the debts of another corporation legally organized, because it controlled such corporation by reason of ownership of its stock, or otherwise, except by reason of contract or on grounds of agency, or of estoppel, or because the controlled corporation has been used in such a way that the maintenance of its character as a separate and distinct entity would work injustice. The cases are too numerous and some of them too complicated for elaborate discussion here, but attention may be called to a few by way of illustration:

Interstate Tel. Co. v. B. & O. Tel. Co. of Baltimore County and Baltimore & Ohio R. R. Co., 51 Fed. 49 (C. C.), affirmed in 54 Fed. 50, 4 C. C. A. 184 (C. C. A. 4), headnote in the Circuit Court by the district judge:

"The Baltimore & Ohio Railroad Company, having power to transact a general telegraph business, and being the owner of an extensive telegraph system, caused the Telegraph Company of Baltimore County to be incorporated with a small capital, and in its name made a contract with the complainant. For breach of that contract the complainant recovered judgment against the Telegraph Company of Baltimore County. The Baltimore and Ohio Railroad Company sold out its whole telegraph system to the Western Union Telegraph Company, and the Telegraph Company of Baltimore County was left without assets of any kind, and became insolvent. Held, that as the railroad company was the sole stockholder of the Telegraph Company of Baltimore County, and appointed its officers, and held it out as having authority to contract with regard to the whole system owned by the railroad company, the Telegraph Company of Baltimore County was a mere agent of the railroad company, a mere name, in fact, under which the railroad company conducted its telegraph business, and that, under the circumstances of this case, a court of equity had jurisdiction to decree that the railroad company, as principal, should pay complainant's judgment against its agent, from which it had taken all the property which it had represented that its agent controlled."

In the case In 're Muncie Pulp Co., 139 Fed. 546, 71 C. C. A. 530 (C. C. A. 2), that company, a New York corporation, manufactured pulp at Muncie, Ind. It organized the Great Western Natural Gas & Oil Company to furnish it with gas or oil to which it transferred its gas and oil well property. It made various expenditures for the benefit of the Great Western Company, which it treated as an agent which the law made necessary for the full development of its business. The Great Western Company kept no separate set of books. Its entire

administration department was under the control of the Muncie Company, and it had no creditors. Two persons owned all of the stock in each corporation. On the bankruptcy of the Muncie Company, the petition of its receiver that the Great Western Company turn over to him the property in its name, it was held that the assets of the Great Western Company were the assets of the Muncie Company, and that the stock of the former belonged to the Muncie Company, and was held by those in whose name it was as trustee for that company. The ground of the decision was that to hold otherwise would be a fraud on the creditors of the Muncie Company.

In Gay v. Hudson River Elec. Power Co., 187 Fed. 12, 109 C. C. A. 66 (C. C. A. 2), the Hudson River Electric Power Company had eight associated and subsidiary corporations, one of which was the Hudson River Electric Company, a distributing and not a generating company. The subsidiary company contracted with the General Electric Company to furnish it power, payment for which was to be made to the subsidiary company. It furnished power, amounting to a large sum. The General Electric Company sold merchandise to the controlling company in approximately the same amount it owed for the power to the subsidiary company. The question was whether or not the debt of the General Electric Company to the controlling company could be set off against the debt of the General Electric Company to the subsidiary company. The decision went on the ground that the set-off could be made because of an agreement to that end between the parties. The opinion was by the same judge who wrote the opinion in the case In re Watertown Paper Co., in which the doctrine of the second exception was first declared. Referring to that case and quoting the exception announced in it, the learned judge said (15):

"There would be much ground for holding that the Hudson River Electric Company comes within the second exception to the rule of distinct corporate existence. The record clearly indicates that it was organized and controlled as a subsidiary corporation, and that its affairs were so conducted as to make it, practically, an adjunct of the managing corporation—the Hudson River Electric Power Company. It would seem that we would not be departing from established principles if we should regard this book credit of the Hudson River Electric Company as really existing in favor of the managing corporation, the Electric Power Company, against which, without special agreement, this demand against the managing corporation might properly be offset. It would be equitable so to hold. The Hudson Electric Company did not generate the power which it sold. It obtained it only through the bookkeeping of the managing company from another subsidiary corporation. The managing corporation did not use the merchandise which it bought. It distributed it among the various subsidiary companies. The offset could hardly be regarded as unfair to the Hudson River Electric Company, while it would be grossly unfair to the General Electric Company to compel it to pay its indebtedness to one of the companies and to look to an insolvent associate for the payment of its own account.

"But it is unnecessary to decide this case upon the ground just considered, and we distinctly refrain from so doing."

This language is open to the inference that the court hesitated to apply the doctrine, although seemingly applicable. If it were, there would seem to be no reason why the offset should not have been allowed, both because the relations of the company were such that one was an adjunct of the other, and because of express agreement to

that end. This hesitancy makes the case the more valuable in this discussion, because it is of the court which first announced the doctrine, and the decision is more important still, because the doctrine, had it been applied, was expressly based on the unfairness to the General Electric Company of denying the offset.

In Stark Electric R. Co. v. McGinty Contracting Co., 238 Fed. 657, 663, 151 C. C. A. 507, McGinty Contracting Company entered into an agreement with Interurban Construction Company for work done in the construction of the Stark Electric Railroad. This court held that the Suburban Company was but a "dummy" or "buffer" organized by the Electric Company; that McGinty Company "believed in good-faith that its contract was in reality with the railroad company" and "that the construction company for the convenience of the railroad company, and with the knowledge of everybody interested in the transaction, was, with respect to the contract in question, 'masquerading, acting for and put forth substantially as' the railroad company." Justice required the railroad company to be held liable for its construction company's contract, and it was so held.

Foard Co. v. State of Maryland, 219 Fed. 827, 135 C. C. A. 497 (C. C. A. 4), involved negligence in admiralty. Carelessness of a workman of the Stevedoring Company in stowing dynamite in a ship caused great damage. Foard Company ship brokers and agents, organized that company as a department of its business. The companies had the same officers. Foard Company handled all the funds, and paid all the losses which were dealt with as if they were its own losses. It kept all the profits. It was held that the Stevedoring Company was organized and controlled and its affairs so conducted as to make it a mere instrumentality of the Coal Company, and for that reason the two corporations must be regarded as to the outside public, identical. The cases relied on are Interstate Telegraph Co. v. Baltimore, etc., Co. (C. C.) 51 Fed. 49; same case in 54 Fed. 50, 4 C. C. A. 184; In re Watertown Paper Co., 169 Fed. 252, 94 C. C. A. 528; and Chicago, etc., Co. v. Myers, 168 Ill. 139, 48 N. E. 66—showing that the ground of the decision was the injustice of holding only the Stevedoring Company responsible for the damage which was caused really by the Foard Company acting through its Stevedoring Company In the Illinois case, the Gas Company was held responsible for the injury, because the construction company was "its mere agent or tool."

Whatever "adjunct" may mean in this connection, it must, to be applicable at all, be given a new definition, involving the idea of sinister purpose or wrongful results. If it means agency or instrumentality in the sense of means to effect wrong, or through which wrong is done, we would be content with it. But it is a word too uncertain in meaning to be incorporated into an inexorable rule of law as an exception to a just rule long established unless qualified in such a way as to cover the kind of cases to which it was intended to apply; cases in which adherence to the doctrine of the separate and distinct entity of a corporation would work injustice.

It will be noticed that, when the exception was first declared, no authorities were cited as a basis for its deduction. We have found none,

and in all the decisions we have examined, in which corporate entity has been disregarded, the reasons were principles of agency, or estoppel, or because justice required it. The law on the subject will be found, we think, in the Second Carpenter Case, wherein it was said:

"That a court of equity will disregard corporate forms when they have been used to do injustice." 235 Fed. 17, 28 (148 C. C. A. 511).

And we approve what was said by Judge Sater (In re Rieger [D. C.] 157 Fed. 609, 613):

"The doctrine of corporate entity is not so sacred that a court of equity, looking through forms to the substance of things, may not in a proper case ignore it to preserve the rights of innocent parties or to circumvent fraud."

We do not think the Circuit Court of Appeals in the Second Circuit, when announcing the exception, had in mind, by the use of the words under discussion, any meaning different from the interpretation they seem to us to bear, and we cannot accept the exception unless qualified in substance as suggested.

We are of opinion that, whatever the relation between the Wheeling and the Coal Company was, no injustice is worked to these bondholders by holding the bonds to be executed and delivered by the Coal Company in its corporate capacity separate and distinct from the Wheeling and as its own debt. For reasons we need do no more than to quote from the views of this court heretofore expressed. In the First Carpenter Case, 218 Fed. 273, 283, 284 (134 C. C. A. 69):

" * * * This coal company existed only on paper, and was owned and controlled by the railroad company. It made no move of its own volition but was manipulated by the railroad company for its own purposes and in its own interests. But even if this is true, the bondholders knew the relation of the railroad company to the coal company, and with that knowledge accepted the bonds. It therefore cannot be held that the prior lien obligations are the contract debt of the railroad company in the sense that it itself executed those obligations. Such a holding would necessarily involve the indebtedness of the railroad company on the bonds themselves. This the bondholders do not claim. No corporate form was used to deceive them. So far as express contract rights are concerned, the bondholders dealt with the coal company as a separate and distinct entity."

Then the opinion dealt with the implied agreement of the Wheeling to furnish sufficient cars.

In the Second Carpenter Case, 235 Fed. 17, 28 (148 C. C. A. 511):

" * * * Absolute good faith, so far as the use of corporate forms and the relation of the Railroad Company to the Coal Company and to the bondholders are concerned, dominated the dealings between the bondholders and the Wheeling, and their entire transactions were on the basis of the Coal Company's separate and independent corporate existence. There is no ground upon which to base a finding that these bonds are, either at law or in equity, a debt of the railroad."

Again (235 Fed. 27, 148 C. C. A. 511):

"The prior lien obligations and the bonds of the Wheeling's Coal Company involved in Carpenter's suit were the debt of the Coal Company, secured by mortgage on its land and property. The bondholders took the bonds on that understanding. They knew the Coal Company was but an adjunct and agency of the Wheeling, yet they did not look to the Wheeling for the payment of those obligations to the holders thereof, and for the payment of the bonds

to themselves, because of that relation, but expressly contracted with it for contributions to be paid by it to be applied, together with royalties paid by Hanna & Co.'s Mining Company, to the payment, first, of the prior lien obligations, and, second, to the bonds on allotment under the plan upon which the Coal Company was reorganized. It was undoubtedly expected that, during the operation of the plan for its 10 years of life, the prior lien obligations would be paid off and something paid on the bonds, and then, by some new arrangement, the mortgage debt of the Coal Company, being by that much reduced, could be taken care of out of the mines of the Coal Company."

Assuming that the issue was not raised in the First Carpenter Case, and conceding that the views of this court in the Second Carpenter Case were, for reasons given in the opinion on the petition for a rehearing, obiter dicta, nevertheless the status of these bonds was a question, under the circumstances in each case, such as to naturally provoke discussion and it received the deliberate consideration of this court. After careful reconsideration, we see no reason to depart from the conclusions therein expressed.

On the contrary, we think the allowance of these bonds as a debt against the Wheeling would be clearly an injustice to it. Assuming the exception to be as stated, yet the bondholders cannot avail themselves of the assumption. They were a party to the plan of reorganization of the Coal Company which committed its ownership and control to the Wheeling. The purposes of the plan were to pay off the prior lien obligations; the interest on these bonds and as many of the bonds themselves as the plan's operations permitted. The bonds were to be paid out of the successful operation of the plan and out of the coal lands mortgaged for their security. This was the understanding of the bondholders and of the Wheeling.

From the day that plan was adopted, the relation of the Wheeling to its Coal Company has not changed. If these bonds are the Wheeling's obligations now, they were then. Yet, notwithstanding the elaborate arrangement for the protection of these bondholders, to which they were a party, they would now ingraft on the Wheeling an additional obligation to pay the bonds in any event as its own debt. The bondholders' rights under that arrangement are based on the separate corporate existence of the Coal Company. The rights they now claim are based on its nonexistence. As to them, it was one or the other, and could not be both. The bondholders, with full knowledge, chose to treat it as a separate corporation distinct from the Wheeling, and on that theory they obtained a recovery in the First Carpenter Case. They cannot now, to the injury of the Wheeling, obtain a recovery on the ground that it was not distinct from the Wheeling but was the Wheeling itself. It was not the intention of the bondholders or the Wheeling that the Wheeling should be liable on these bonds; and it may safely be said that if the Wheeling had known that the bondholders claimed, or ever would claim, that, in effect, the Coal Company's bonds were its obligations because the Coal Company had no separate corporate existence from it, it never would have devised and become a party to the plan for the payment of these bonds based on the Coal Company's separate corporate existence.

It follows from all of these considerations that the decree of the District Court should, and it will, be, reversed, at appellee's costs.